

**ORDERED in the Southern District of Florida on September 10, 2010.**

_____
A. Jay Cristol, Judge
United States Bankruptcy Court

---

### IN THE UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
### www.flsb.uscourts.gov

In re:

ARTECITY MANAGEMENT LLC, et al.[1]

    Debtors.

_____/

Chapter 11

Case No. 10-31406-AJC
Jointly administered

**ALL CREDITORS AND PARTIES IN INTEREST SHALL BE DEEMED TO
CONSENT TO THE RELIEF SET FORTH IN THE ORDER BELOW ON AN INTERIM
BASIS UNLESS AN OBJECTION IS FILED NO LATER THAN
5:00 P.M., EASTERN STANDARD TIME, ON TUESDAY, SEPTEMBER 14, 2010.**

---

[1]    The Debtors in the these jointly administered cases, along with the last 4 digits of their taxpayer identification numbers following in parenthesis, are as follows:  Artecity Management LLC (2357); Artecity Holding Ltd. (9763); Artecity Governor L.L.C. (3220); Artecity Park LLC (6068); Artecity Plaza LLC (3734); Artepark South Development LLC (5232); Park Villas Development LLC (5344).

## ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362 AND 364, AND (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDER PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364

**THIS MATTER** came on for hearings before the Court on August 12, 2010 at

3:00 p.m., August 30, 2010 at 10:00 a.m., September 3, 2010 at 10:00 a.m., September 8, 2010 at

10:30 a.m., and September 9, 2010 at 11:30 a.m. (collectively, the "**Hearing**"), upon the Motion

of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") pursuant

to sections 105(a), 361, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et*

*seq.* (the "**Bankruptcy Code**") and Bankruptcy Rule 4001[2] for Entry of an Order Authorizing

Debtors to (I) Obtain Postpetition Financing Secured by a Lien Equal to the Lien of Debtors'

Prepetition Lender, and a Super-Priority Administrative Expense Claim, (II) Use Proceeds from

Sale of its North and South Tower Condominium Units to Fund Completion of Construction of

the Project and (III) Grant Adequate Protection of the Prepetition Lender's Interests in Property

of the Estate  [D.E. 12], Debtors' Supplement thereto [D.E. 58], and Debtors' Second

Supplement thereto [D.E. 87] (collectively, the "**DIP Motion**")[3] and the Objection of Corus

Construction Venture LLC to the Debtor's Motion to Obtain Postpetition Financing and Use of

Cash Collateral [D.E. 56] (the "**CCV Objection**"), as well as the *ore tenus* relief proposed at the

Hearing, seek entry of a final order (this "**Order**") that, among other things:

(i)  authorizes Artecity Holding Ltd. ("**Holding**") to obtain, and authorizes

each of the other Debtors except for Artecity Management LLC, in their capacity as guarantors

---

[2]  This order complies with the Court's Guideline for Motion Seeking Authority to Use Cash Collateral and Motions Seeking Approval of Postpetition Financing [CG-7 (12/01/09)] (the "*Guidelines*") (see local rules and forms link on www.flsb.uscourts.gov), which govern any motion seeking approval of the incurrence of secured or super-priority debt under section 364 of the Bankruptcy Code or the use of cash collateral under section 363 of the Bankruptcy Code.

[3]  Unless otherwise indicated, capitalized terms used herein shall have the meaning ascribed in the CCV Objection.

#456828 v5

(collectively, the "**Guarantors**") to unconditionally guaranty, jointly and severally, Holding's

obligations in respect of senior secured postpetition financing consisting of a first priority

"priming" senior secured revolving credit facility of up to $2.725 million in aggregate principal

amount (the "**DIP Loans**," and such credit facility, the "**DIP Facility**") pursuant to the terms of

(x) this Order, (y) that certain Debtor-In-Possession Loan and Security Agreement, dated as of

[September ___, 2010] (as the same may be amended, restated, supplemented or otherwise

modified from time to time, the "**DIP Credit Agreement**"),[4] by and among Holding, each of the

Guarantors, Corus Construction Venture LLC ( "**CCV**" or the "**DIP Lender**") and (z) any and

all other Loan Documents (as defined in the DIP Credit Agreement and, together with the DIP

Credit Agreement, the "**DIP Facility Documents**");

        (ii)    authorizes use of the proceeds of the DIP Facility in a manner consistent

with the terms and conditions of the DIP Facility Documents, and in accordance with the budget

attached to this Order as Exhibit "A" (the "**Budget**"), subject to the Permitted Budget Variance

(as defined below), solely for the purposes set forth in the Budget to pay for costs to complete

construction and sell the condominium units (the "**Units**") in the Debtors' real estate project

located in Miami Beach, Florida, known as ARTECITY (the "**Artecity Project**");

        (iii)    approves the terms of, and authorizes the Debtors to execute and deliver,

and perform under, the DIP Credit Agreement and the other DIP Facility Documents and to

perform such other and further acts as may be required in connection with the DIP Facility

Documents;

        (iv)    authorizes each Debtor to grant to the DIP Lender (x) liens on all of the

DIP Collateral (as defined below) pursuant to sections 364(c)(2), (c)(3) and (d) of the

---

[4]      Unless otherwise specified, all capitalized terms used herein without definition shall have the
respective meanings given such terms in the DIP Credit Agreement.
#456828 v5

Bankruptcy Code (the "**DIP Liens**"), which DIP Liens shall be senior to the Prepetition Liens (as defined below), and (y) pursuant to section 364(c)(1) of the Bankruptcy Code, super-priority administrative claims having recourse to all prepetition and postpetition property of the Debtors' estates, now owned or hereafter acquired, excluding proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law ("**Avoidance Actions**"), whether received by judgment, settlement or otherwise;

        (v)    grants, as of the Petition Date and as further described below, certain adequate protection to CCV under and in connection with that certain Construction Loan Agreement, dated as of September 26, 2005 (the "**Prepetition Credit Agreement**," and, together with all other loan and security documents executed in connection therewith, and as modified, the "**Prepetition Loan Documents**"), by and among Holding, certain of its subsidiaries and affiliates, and Corus Bank, N.A. (the original lender);[5]

        (vi)    vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Facility Documents and this Order; and

        (vii)    waives any applicable stay (including under Bankruptcy Rule 6004) to the extent that this Order shall be effective two business days after it is entered by the Court.

The Court having considered the DIP Motion, the testimony of the witness(es), argument of counsel at the Hearing, and the other evidence admitted at the Hearing, if any, and in accordance with Rules 2002, 4001(b), (c), and (d), and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the local rules of the Court; having reviewed the

---

[5]    CCV is the assignee of those certain documents that evidence the Prepetition Loan Documents from the Federal Deposit Insurance Corporation, as Receiver, for the original lender, Corus Bank, N.A.

#456828 v5

record in these proceedings (including those items judicially noticed at the Hearing), due and proper notice of the DIP Motion and the Hearing having been given; and it appearing that approval of the relief requested in the DIP Motion as modified *ore tenus* during the Hearing, is fair and reasonable and in the best interests of the Debtors, their creditors and their estates, and is essential to complete construction and sell the condominium units in the Artecity Project; and all objections, if any, to the entry of this Order having been withdrawn, resolved or overruled; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

<strong>IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED[6], that:</strong>

A.   **Petition Date**.  On July 26, 2010 (the "**Petition Date**"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the management and operation of their business and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these Chapter 11 cases.  These Chapter 11 cases have been ordered jointly administered for all purposes.

B.   **Jurisdiction and Venue**.  This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§157(b) and 1334, and over the persons and property affected. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. §157(b)(2). Venue for these Chapter 11 cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§1408 and 1409.

C.   **No Committee Formation**.  The United States Trustee has not appointed an official committee of unsecured creditors in these Chapter 11 cases (the "**Committee**").

---

[6]   Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

#456828 v5

D.    **Notice**. The Hearing was held pursuant to the authorization of Bankruptcy Rule 4001. Notice of the Hearing and the relief requested in the DIP Motion was provided by the Debtors to (i) the Office of the United States Trustee for the Southern District of Florida, (ii) CCV; (iii) all other known secured creditors of the Debtors, and (iv) all unsecured creditors of the Debtors. Under the circumstances, such notice of the Hearing and the relief requested in the DIP Motion is due and sufficient and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code, Bankruptcy Rules 2002, 4001(c), 4001(d) and the Local Rules of the Court. Further, this Proposed Order is being served on all creditors and parties in interest with good and sufficient notice of their opportunity to object to the terms herein. Under the circumstances, such notice of the Proposed Order constitutes good and adequate notice.

E.    **Debtors' Stipulations Regarding the Prepetition Credit Facility**. The Debtors admit, stipulate, acknowledge and agree (the paragraphs in this subsection shall be referred to collectively as the "**Debtors' Stipulations**") as follows:

(i)    Prepetition Credit Facility. Pursuant to the Prepetition Credit Agreement, CCV (as assignee of all rights to enforce collection of the original loan extended by Corus Bank, N.A.) extended loans to the Debtors from time to time. All obligations of the Debtors arising under the Prepetition Credit Agreement or any other Prepetition Loan Document shall collectively be referred to herein as the "**Prepetition Obligations**."

(ii)    Prepetition Indebtedness. As of the Petition Date, the Debtors were truly and justly indebted to CCV pursuant to the Prepetition Loan Documents, without defense, counterclaim or offset of any kind, in respect of loans made by CCV (as assignee of all rights to enforce collection of the original loan extended by Corus Bank, N.A.) in the aggregate principal amount of not less than $45,233,970.56, *plus* all accrued or, subject to section 506(b) of the

#456828 v5

6

Bankruptcy Code, hereafter accruing and unpaid interest thereon, Protective Advances (defined below) and any additional fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Loan Documents) now or hereafter due under the Prepetition Credit Agreement and the other Prepetition Loan Documents (the "**Prepetition Indebtedness**").

(iii)    Prepetition Security Interests and Prepetition Collateral.  Pursuant to the Prepetition Loan Documents, the Debtors granted to CCV, to secure the Prepetition Obligations, first priority continuing liens on (the "**Prepetition Liens**") and first priority security interests in (the "**Prepetition Security Interests**") all or substantially all of the Debtors' assets and property and all proceeds, products, accessions, rents and profits thereof, in each case whether then owned or existing or thereafter acquired or arising, except the amount of $52,000.00 in proceeds from a prepetition loan made to Debtors by certain interest holders and currently deposited in Artecity Management LLC's account.  All collateral granted or pledged by such Debtors pursuant to any Prepetition Loan Documents and all prepetition and postpetition proceeds thereof shall collectively be referred to herein as the "**Prepetition Collateral.**" As of the Petition Date, (I) the Prepetition Liens and Prepetition Security Interests (a) are valid, binding, enforceable, and perfected, (b) were granted to, or for the benefit of, CCV for fair consideration and reasonably equivalent value, (c) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (d) are subject and subordinate in all respects only to (A) the DIP Liens (as defined below), and (B) the Carve-Out (as defined below), and (II) (w) the Prepetition Obligations constitute legal, valid and binding obligations of the applicable Debtors, enforceable in accordance with the terms of the applicable Prepetition Loan Documents (other than in respect of

the stay of enforcement arising from section 362 of the Bankruptcy Code), (x) no setoffs, recoupments, offsets, defenses or counterclaims to any of the Prepetition Obligations exist, (y) no portion of the Prepetition Obligations or any payments made to CCV is subject to avoidance, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (z) each of the guarantees of the Prepetition Obligations, if any continues in full force and effect notwithstanding any financing and financial accommodations extended by CCV to the Debtors pursuant to the terms of this Order or the DIP Facility Documents.

(iv)    <u>Release of Claims</u>. Each Debtor and its estate shall be deemed to have forever waived, discharged, and released CCV, together with its affiliates, agents, attorneys, financial advisors, consultants, officers, directors, and employees (all of the foregoing, collectively, the "**Prepetition Released Parties**") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, setoff, recoupment, or other offset rights against any and all of the Prepetition Released Parties, whether arising at law or in equity, with respect to the Prepetition Obligations and Prepetition Security Interests, including, without limitation, (I) any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code, or under any other similar provisions of applicable state or federal law, and (II) any right or basis to challenge or object to the amount, validity, characterization or enforceability of the Prepetition Obligations, or the validity, characterization, enforceability, priority, or non-avoidability of the Prepetition Security Interests securing the Prepetition Obligations.

(v)    <u>No Priming of DIP Facility and DIP Liens</u>. The Debtors agree that until such time as all obligations under the DIP Facility (the "**DIP Obligations**") are indefeasibly paid

in full in cash (or otherwise satisfied according to such terms as may be mutually agreed among the Debtors and the DIP Lender), the Debtors shall not in any way prime or seek to prime the security interests and DIP Liens by offering a subsequent lender or a party-in-interest a superior or *pari passu* lien or claim on the DIP Collateral (as defined below) or a claim pursuant to section 364(c) or 364(d) of the Bankruptcy Code or otherwise.

(vi)    No Impairment.  Without the prior express written approval of the DIP Lender, the Debtors shall not (I) file with the Bankruptcy Court any pleading or request to (A) limit, alter, modify, or terminate any provision of the DIP Facility Documents, this Order, or any protection granted to DIP Lender thereunder, or (B) extinguish, subordinate or diminish any security interest, lien or claim of the DIP Lender, or (II) seek, consent to, or join in the approval of any matter or any plan of reorganization or liquidation which purports to do any of the things described in this subsection, except that under its exclusive period the Debtor may file a plan of reorganization that provides for the valuation of CCV's secured claim that treats the classes of creditors in such plan consistent with § 1129 (a) and (b) of the Bankruptcy Code.

F.      **Findings Regarding the Postpetition Financing**.

(i)     Need for Postpetition Financing.  The Debtors require the DIP Facility to, among other things, complete the construction of the Project, permit the orderly continuation of the operation of their businesses, maintain business relationships with vendors, suppliers and condominium buyers, and to satisfy other working capital and operational needs. The Debtors' access to sufficient capital and liquidity through borrowing under the DIP Facility is vital to completion of the Project and successful reorganization of the Debtors.

(ii)    No Credit Available on More Favorable Terms.  The Debtors have been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as

an administrative expense. The Debtors have also been unable to obtain secured credit, allowable only under sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code on more favorable terms and conditions than those provided in the DIP Facility Documents and this Order. The Debtors are unable to obtain credit for borrowed money without granting to the DIP Lender the DIP Protections (as defined below).

      **G.**    **Extension of Financing.** The DIP Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Facility Documents and subject to (i) the entry of this Order, and (ii) findings by the Court that such financing is essential to the Debtors' estates, that the DIP Lender is a good faith financier, and that the DIP Lender's claims, super priority claims, senior security interests and priming liens and other protections granted pursuant to this Order and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

      **H.**    **Business Judgment and Good Faith Pursuant to Section 364(e).**

        (i)    The terms and conditions of the DIP Facility and the DIP Facility Documents, and the fees and costs to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.

        (ii)    The DIP Facility and this Order were negotiated in good faith and at arms' length between the Debtors and the DIP Lender.

        (iii)    The use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, as a consequence of which the

DIP Lender is entitled to the full protection and benefits of section 364(e) of the Bankruptcy Code.

I.    **Relief Essential; Best Interest**.  The relief requested in the DIP Motion is necessary, essential, and appropriate for the completion of construction of the Project the continued operation of the Debtors' business and the management and preservation of the Debtors' respective assets, and real and personal property.  It is in the best interest of Debtors' estates to be allowed to establish the DIP Facility contemplated by the DIP Facility Documents subject to the terms of this Order.

J.    **Adequate Protection for CCV's Interest in the Prepetition Collateral**.  CCV has negotiated in good faith regarding the Debtors' use of the Prepetition Collateral to fund the administration of the Debtors' estates, completion of construction of the Project and continued operation of their businesses.  CCV has agreed to permit the Debtors to use the Prepetition Collateral (other than the Prepetition Cash Collateral),[7] subject to the terms and conditions set forth herein, including the protections afforded a party acting in "good faith" under section 364(e) of the Bankruptcy Code.  In addition, the DIP Facility contemplated by this Order provides for a priming of the Prepetition Security Interests pursuant to section 364(d) of the Bankruptcy Code.  CCV is entitled to the adequate protection of its interests in the Prepetition Collateral as set forth herein pursuant to sections 361, 362, 363, 364 and 507(b) of the Bankruptcy Code for the diminution in value of the Prepetition Collateral.  Specifically, the Debtors shall provide as adequate protection: (i) payment to CCV of the proceeds from the sale of Units (net of the payment of ordinary and necessary expenses of closing on the sale, including

---

[7]    Any cash or cash equivalents, funds or proceeds of or derived from the Prepetition Collateral may constitute cash collateral within the meaning of Section 363 of the Bankruptcy Code (the "**Prepetition Cash Collateral**").

#456828 v5

11

but not limited to the real estate taxes or real estate tax pro-rations) (the "**Net Proceeds**") owned by Debtors other than the Governor,[8] up to an amount equal to the average pro rata value of the Unit based on the square footage value of the residential units on the Petition Date ($223.26 per square foot of saleable square feet); and (ii) the DIP Liens and DIP Security Interests. Based on the record presented to the Court at the Hearing, the terms of the proposed adequate protection arrangements and the use of the DIP Facility contemplated by this Order are fair and reasonable, reflect the Debtors' prudent exercise of business judgment, and constitute reasonably equivalent value and fair consideration for CCV's consent thereto.

K.    **Limited Consent**. The consent of CCV to the priming of its liens by the DIP Liens is limited to the DIP Facility presently before this Court, with CCV as DIP Lender, and shall not, and shall not be deemed to, extend to any other postpetition financing or to any modified version of this DIP Facility with any party other than CCV as DIP Lender. Nothing in this Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of CCV are or will be adequately protected with respect to any priming of the Prepetition Liens and Prepetition Security Interests.

L.    **Section 552**. In light of the subordination of its Liens and super-priority administrative claims to (i) the Carve-Out in the case of CCV's DIP Collateral, and (ii) the Carve-Out and the DIP Liens in the case of CCV's Prepetition Collateral, CCV is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception shall not apply.

---

[8]    Net proceeds from the sale of Units in the Governor building shall be paid to CCV as additional adequate protection of its interests in the Prepetition Collateral to be applied to the Prepetition Indebtedness in accordance with the Bankruptcy Code.

#456828 v5

**NOW, THEREFORE**, on the DIP Motion of the Debtors and the record before this Court with respect to the DIP Motion, and with the consent of the Debtors and the DIP Lender to the form and entry of this Order, and good and sufficient cause appearing, it is:

**ORDERED** that:

1.    **Motion Granted**.  The DIP Motion is granted in accordance with and limited to the terms and conditions set forth in this Order and the DIP Facility Documents.

2.    **Approval of the Terms of the DIP Facility.**  The DIP Facility is a senior secured revolving credit facility with the following material terms:[9]

    a)    **Parties**:  (a) DIP Lender is CCV; (b) Borrower is Artecity Holding Ltd.; (c) Guarantors, which along with the Borrower shall be jointly and severally liable, are: (i) Artecity Governor L.L.C.; (ii) Artecity Park LLC; (iii) Artecity Plaza LLC; (iv) Artepark South Development LLC; and (v) Park Villas Development LLC.

    b)    **Maximum Outstanding Loan Amount**:  $2.725 million, to be made available in two separate tranches.

    c)    **Purpose**:  The purpose of the DIP Facility is to providing sufficient funding to complete construction of, and sell the units in, the Artecity Real Estate Project.

    d)    **Interest Rate**:  The interest rate shall be 6% per annum and 11% per annum after default.  Interest shall accrue commencing upon the funding of the Initial Draw Request (defined below) and be paid at maturity.

    e)    **Use of DIP Loan Proceeds**.  Proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Facility Documents, and in strict compliance with the Budget, subject to the Permitted Budget Variance, solely for the purposes set forth in the Budget to pay:  (a) the costs to complete construction of the Artecity North and South buildings, and the Plaza and Villas buildings, and (b) the costs to administer the Chapter 11 case, but solely to the extent set forth in the Budget. Without further order of the Court, the Debtors are not authorized to make or incur any expenditures except in accordance with the Budget and this Order, provided that, for any period commencing on the Initial Funding Date, and ending on the last day of each month thereafter (such period being the "**Monthly Period**"), actual cumulative expenditures during such Monthly Period do not exceed the cumulative permitted amount of such expenditures for such Monthly Period set forth in the Budget by more than 10%, (the "**Permitted Budget Variance**"), and the variances in total will not exceed the overall

---

[9]    In the event of any inconsistency between the terms and conditions of the DIP Facility Documents and of this Order, the provisions of this Order shall govern and control.

#456828 v5

13

budget.  The Debtors may exceed a Permitted Budget Variance during a monthly period if (1) (i) the Debtors first seek consent from the DIP Lender with respect to the variance and (ii) if the variance is disputed, seek Court approval based on their ability to demonstrate that exceeding the Permitted Budget Variance will result in an earlier and/or more efficient completion of construction of one or more the Debtors' buildings and (2) that the variance will not exceed the overall budget.  No reallocations shall be permitted to or from any contingency Budget line item or any other Budget line item to provide for any further amounts to be paid to the Debtors, or any Affiliates or member of any Debtor, including but not limited to Sunny Houses Cons, LLC, European Advisors, LLC, Piero Salussolia, P.A., Claudio Benedetti, or Alessandro Ferretti.  The final two months of management fees budgeted to Sunny Houses Cons, LLC, European Advisors, LLC, and Piero Salussolia, P.A., shall be held in the trust account of the Debtors' counsel's law firm and shall not be disbursed until full repayment of the DIP loan.  However, this provision shall not be interpreted to prejudice Debtors' right to seek management fees as part of the Plaza/Villas budget, nor prejudice DIP Lender's right to object to such management fees.

f)    **Funding of Draw Requests**:  To obtain funding of a construction draw request under the DIP Facility (each a "**Draw Request**"), the Debtors must submit the request in writing to the DIP Lender and/or its designee.  Draw Requests and funding of any Draw Requests shall not occur more often than once every two weeks.  The full amount of the first Draw Request under the DIP Facility (the "**Initial Draw Request**") shall be disbursed by CCV to the trust account of Counsel to the Debtors, upon CCV's approving the Initial Draw Request, and Counsel for the Debtors shall disburse to the initial payees upon receipt of the funds.  All subsequent Draw Requests shall be funded through Holding's debtor-in-possession operating account (account number ending in 2938) at CitiBank.  CCV reserves the right to object to any line item contained in any Draw Request, and at its discretion fund only part of any such request.  To the extent CCV objects to any portion of a Draw Request, CCV agrees to fund the non-objectionable portion of such request, if any.  CCV agrees to fund or object to any Draw Request within 10 days of its receipt of such request that complies with the requirements of the DIP Facility Documents.  Any dispute relating to any objection to any portion of a Draw Request shall be resolved by the Court.

g)    **DIP Loan Tranches.**  The DIP Loan shall be funded in two separate tranches.  An initial tranche will fund costs to complete construction of the Artecity North and South buildings (the "**Initial Tranche**"), in the amount of $2.725 million.  Following completion of construction funded by the Initial Tranche, repayment of and reduction in the amount due under the Intitial Tranche in an amount of not less than $500,000, the DIP Lender will re-loan and make funds available under a second tranche to fund costs to complete construction of the Plaza and Villa buildings (the "**Second Tranche**"), in an amount not to exceed $2.5 million.  The maximum amount available to be outstanding at any time under both tranches in the aggregate is $2.725 million, plus interest.

- **The Initial Tranche.**  The "**Initial Funding Date**" means the date on which CCV funds the first Draw Request from the Debtors under the Initial Tranche.

- **Initial Tranche Benchmarks**

  o <u>Budget</u>. Once the Budget has been approved by CCV, no changes may be made to the Budget without the prior written approval of CCV; provided, however, CCV shall not unreasonably withhold consent to reallocation of amounts among individual budget items so long as (1) the reallocation is a result of savings in another budget line item and such savings are evidenced by a valid, executed contract with the relevant subcontractor(s), and (2) the reallocation does not result in increasing the total budget for the Artecity North and South buildings.

    - <u>Budget for North and South Buildings</u>. Prior to the Initial Funding Date, the Debtors have provided a Budget for the construction of the Artecity North and South buildings, attached as Exhibit A, which covers all hard and soft costs to complete construction of the North and South buildings, manage the Artecity Real Estate Project, and market and sell condominium Units in the Project, administrative expenses, condominium dues, including all costs of every kind associated with the Project. Real estate taxes shall be paid as provided in subparagraph 12(e) below.

    - <u>Budget for Plaza and Villas</u>. Within ninety (90) days after the Initial Funding Date, the Debtors must provide to CCV a Budget to govern completion of construction of the Plaza and Villas, which shall cover all hard and soft costs to complete construction of the Plaza and Villa buildings, manage the Artecity Real Estate Project, and market and sell condominium Units in the Project, administrative expenses, condominium dues, including all costs of every kind associated with the Project. Real estate taxes shall be paid as provided in subparagraph 12(e) below.

  o <u>Completing construction</u>

    - Within four (4) months of Initial Funding Date, the Artecity North and South buildings must be completed and the Debtors must have filed an application for a Certificate of Occupancy ("**CO**") which in good faith complies with the requirements of applicable law.

    - Within six (6) months of Initial Funding Date, the Debtors must have obtained a CO or a conditional CO for the Artecity North and South buildings.

  o <u>Selling Units</u>

    - Within six (6) months of the Initial Funding Date, the Debtors must have achieved at least 35 Unit sales, evidenced by valid Sales Agreements, as defined in Section 14.2 of the Prepetition Credit Agreement, and proof of deposits from the buyers made into the trust account of the Debtors' counsel's law firm (the "**LKL Trust Account**"). For buyers under existing contracts that reaffirm or renegotiate the original contracts, buyers

must agree to release any earnest money deposits, to be placed in the LKL Trust Account. The Debtors and CCV agree to seek Court approval of an expedited unit sale procedure, so long as the procedure is not inconsistent with this Order.

- <u>Unit Price</u>. Units must be sold at or above the minimum sale price in the "**Price List**," which is defined as the agreed upon price list for all Units at the North, South, Villas, and Plaza buildings, developed by the Debtors and approved by CCV, in writing. A Unit may be sold at a price less than that set forth in the Price List, only with the DIP Lender's prior, written consent, which may be withheld in its sole discretion. However, as part of the initial 35 contracts described in this Order, the actual sales price may be up to five percent (5%) less than the price set forth in the Price List, for up to no more than ten (10) units. However, none of the penthouse units shall be eligible for such 5% variance from the Price List (North, Units PH-601 – PH-608; South, Units PH-501 – PH-511; and Plaza, Units PH-209 and PH-210). The average gross sales price per square foot for all units sold shall be no less than the average price per square foot on the Price List agreed to by Debtors and CCV and set forth in the record.

o <u>Repayment of Initial Tranche</u>

- Within eight (8) months of the Initial Funding Date, the Debtors must have repaid, with Excess Proceeds (as hereinafter defined), the entire principal disbursed and interest due on the Initial Tranche.

- As set forth above, CCV shall be paid, as adequate protection payments, from the Net Proceeds from the sale of Units owned by Debtors other than the Governor in an amount equal to $223.26 per square foot of saleable square feet of such Units, and such payments may be applied to principal, protective advances, interest, costs, or other fees, at CCV's sole discretion, under the Prepetition Indebtedness. Notwithstanding the foregoing right of CCV to apply adequate protection payments to the Prepetition Indebtedness, the amount of CCV's claim or claims shall be determined in accordance with the Bankruptcy Code. Any Net Proceeds in excess of $223.26 per square foot per Unit shall be referred to as "Excess Proceeds."

- After adequate protection payments, the Excess Proceeds shall be applied towards repayment of the Initial Tranche.

- Net proceeds from the sale of Units in the Governor building shall not be used by the Debtors to pay down the Initial Tranche or the Second Tranche, but instead shall be paid to CCV as additional adequate protection to be applied to principal, protective advances, interest, costs, or other fees, at CCV's sole discretion, under the Prepetition Indebtedness. Notwithstanding the foregoing right of CCV to apply adequate protection

payments to the Prepetition Indebtedness, the amount of CCV's claim or claims shall be determined in accordance with the Bankruptcy Code.

- o  Closing on Contracts

  - Within eight (8) months of the Initial Funding Date, the Borrower must have closed on 20 purchase contracts or closed the sale of units resulting in gross sales proceeds of at least $8,478,000.

  - Within nine (9) months of the Initial Funding Date, the Borrower must have closed on 15 additional purchase contracts; for a total closed contract count of 35 or closed the sale of units resulting in gross sales proceeds of at least $14,836,000.

- **Second Tranche.**  The Second Tranche can only be accessed after the Artecity North and South buildings have been completed and the Initial Tranche has been reduced by no less than $500,000 as a result of receipt of Excess Proceeds.  The total amount outstanding under the Second Tranche shall not exceed the amount of indebtedness under the Initial Tranche which has been repaid, and shall not in any event exceed $2.5 million, plus accrued interest.  The "**Second Tranche Funding Date**" means the date on which CCV funds the first Draw Request under the Second Tranche.  The Second Tranche can be used only to complete construction, including hard and soft costs, and all other line items set forth in the Budget, in connection with the Plaza and Villas.

- **Second Tranche Benchmarks**

  - o  Completing construction

    - Within five (5) months of Second Tranche Funding Date, the Plaza and Villas must be completed and the Borrower must have filed an application for a CO which in good faith complies with the requirements of applicable law.

    - Within seven (7) months of Second Tranche Funding Date, the Borrower must have obtained a CO or a conditional CO for the Plaza and Villas.

  - o  Selling Units

    - Unit Price.  Units located in the Plaza and Villas buildings must be sold at or above the minimum sale price in the Price List.

  - o  Repayment of Second Tranche

    - As set forth above, CCV shall be paid, as adequate protection payments, from the Net Proceeds from the sale of Units owned by Debtors other than the Governor in an amount equal to $223.26 per square foot of saleable

square feet of such Units, and such payments may be applied to principal, protective advances, interest, costs, or other fees, at CCV's sole discretion, under the Prepetition Indebtedness. Notwithstanding the foregoing right of CCV to apply adequate protection payments to the Prepetition Indebtedness, the amount of CCV's claim shall be determined in accordance with the Bankruptcy Code.

- After adequate protection payments, the Excess Proceeds shall be applied towards repayment of the Second Tranche. Upon repayment of the full amount of adequate protection payments, and repayment of the DIP Loan, all remaining proceeds are the cash collateral of the Lender, and shall be retained for distribution in accordance with further order of the Court.

h) **Security**: The DIP Facility will be secured by the DIP Liens and DIP Security Interests granted to the DIP Lender in accordance with the DIP Facility Documents and this Order.

i) **Carve-Out**: Notwithstanding DIP Liens and the DIP Super-Priority Claim granted to the DIP Lender hereunder, the DIP Liens and the DIP Super-Priority Claim shall at all times be junior and subject to (i) payment from the DIP Facility those professional fees and disbursements of professionals retained pursuant to sections 327 or 1103(a) of the Bankruptcy Code by the Debtors listed on the attached Exhibit B, (the "**Professionals**") incurred and accrued by such Professionals through the date immediately prior to the date of the entry of a Default Order or an Event of Default, in an amount not to exceed $215,791.75, provided however, that such professional fees and expenses, upon allowance by order of the Court after the filing of applications by such professionals, shall be paid from the DIP Facility, including awards under Local Rule 2016-1(B)(3)(b), (ii) U.S. Trustee fees pursuant to 28 U.S.C. § 1930(a)(6), and (iii) fees payable to the Clerk of the Bankruptcy Court and any agent thereof which may be paid by the Debtors through draw requests.

j) **Events of Default**.

(1) The occurrence of any of the following events shall constitute an "**Event of Default**", and there shall be no cure period:

- failure of the Debtors to comply with any of their obligations, including but not limited to the deadlines and benchmarks set forth in this Order, including but not limited to: use of the DIP Loan for any purpose other than as set forth in the Budget; failure to timely submit a Budget; failure to timely complete, submit a CO, or obtain a CO for the North, South, Plaza and/or Villas buildings; failure to timely obtain valid Sales Agreements; failure to sell units in compliance with the Price List; failure to timely close on the minimum number of Sales Agreements; failure to timely make adequate protection payments or pay Net Proceeds or Excess proceeds to CCV; and failure to timely repay the DIP Loan;

- failure to pay the DIP Loan at maturity;

- failure to comply with section 362(d)(3) of the Bankruptcy Code;

- the granting of relief from the automatic stay to foreclose a lien or the taking of control or possession of, or the exercise of any right of setoff with respect to, any DIP Collateral;

- the entry by the Bankruptcy Court or another court of competent jurisdiction of an order disallowing any of the DIP Obligations or determining that any provision of the DIP Facility Documents is not enforceable according to its terms;

- the entry by the Bankruptcy Court of an order determining that the DIP Liens or DIP Security Interests are invalid or do not have the priority and extent provided in the DIP Facility Documents or this Order;

- the expiration or termination of the Debtors' exclusive right to file and solicit acceptances of a plan of reorganization under section 1121 of the Bankruptcy Code without the solicitation and filing of acceptances thereof;

- the entry of a Default Order under the DIP Facility Documents (and the expiration of any period of cure, grace or notice, if any, set forth in such agreement relating to such default);

- conversion or dismissal of the Debtors' Chapter 11 cases;

- appointment of a Chapter 11 Trustee or Examiner with expanded powers in any of the Debtors' cases;

- the granting of super-priority claims or liens that impair the super-priority claim and liens granted the DIP Lenders; and

- cessation of construction at the Project for more than thirty (30) days.

(2)    Unless and until the DIP Obligations are irrevocably repaid in full, and all DIP Obligations that survive termination obligations have been cash collateralized to the reasonable satisfaction of the DIP Lender, the protections afforded to the DIP Lender pursuant to this Order and under the DIP Facility Documents, and any actions taken pursuant thereto, shall survive the entry of any order confirming a Plan or converting any of these Chapter 11 cases into a Successor Case, or dismissing any of these Chapter 11 cases, and the DIP Liens and DIP Super-Priority Claim shall continue in these proceedings and in any Successor Case, and such Liens and DIP Super-Priority Claim shall maintain their priority as provided by this Order.

k) **Maturity Date**. All DIP Obligations of the Debtors to the DIP Lender shall be immediately due and payable, and authority to use the proceeds of the DIP Facility Documents shall cease on the date that is the earliest to occur of any of the following events, such earliest date being the "**Maturity Date**":

- Twelve (12) months from the Initial Funding Date;

- The entry of an order confirming a plan of reorganization for any Debtor (unless otherwise agreed to in writing by the DIP Lender);

- The entry of any order converting any Debtor's case to a case under Chapter 7 or to a Successor Case (defined below) under section 1112 of the Bankruptcy Code (unless otherwise agreed to in writing by the DIP Lender);

- The entry of any order approving the 363 sale of all or substantially all of any Debtor's assets (unless otherwise agreed to in writing by the DIP Lender);

- The entry of an order appointing a trustee in any Debtor's case under section 1104 of the Bankruptcy Code;

- The entry in any Debtor's case of an order appointing a responsible officer or any examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under sections 105 or 1104 of the Bankruptcy Code;

- The entry of any order dismissing any Debtor's case under section 1112 of the Bankruptcy Code (unless otherwise agreed to in writing by the DIP Lender); or

- The occurrence of an Event of Default for which applicable notice has been given under this Order or the DIP Facility Documents, and the expiration of any applicable cure period without cure thereof.

l) **Rights and Remedies Upon Event of Default.** Rights and remedies will be triggered upon entry of a final order by the Bankruptcy Court rendering a determination that an Event of Default has occurred (a "**Default Order**").

(1) Immediately following the entry of a Default Order:

- The DIP Lender shall not have any obligation to make any further loans, advances or fund Draw Requests under the DIP Facility Documents, except for funding of the Carve-Out.

- Any automatic stay otherwise applicable to the DIP Lender is modified so that the DIP Lender shall be entitled to (a) commence an Enforcement Action and otherwise exercise its rights and remedies in accordance with this Order and the DIP Facility Documents, and (b) continue litigation to exercise its rights and remedies in accordance with the Prepetition Loan Documents, to secure the Prepetition Obligations, and foreclose CCV's first priority security interest in the Prepetition Collateral.

- The Debtors shall file a motion with the Bankruptcy Court, within 5 business days of the entry of the order determining that a Default has occurred, seeking authority to commence a sale of its assets pursuant to section 363 of the Bankruptcy Code, pursuant to which the Debtors would conduct the sale, and shall thereafter take all reasonable steps to effectuate the sale as soon as possible in accordance with the relevant sections of the Bankruptcy Code.

- the Debtors shall not object to, seek to impair or otherwise interfere with the DIP Lender's right to credit bid the DIP Obligations and Prepetition Indebtedness pursuant to section 363(k) of the Bankruptcy Code.

- The Debtors shall continue to deliver and cause the delivery of the proceeds of DIP Collateral as provided in this Order.

- Such proceeds shall continue to be applied in accordance with the provisions of this Order.

- The Debtors shall have no right to use any of such proceeds other than towards the satisfaction of the DIP Obligations in accordance with the terms of this Order.

(2)     Notwithstanding anything to the contrary contained in this Order or in the DIP Facility Documents, (i) in connection with its exercise of remedies, the DIP Lender shall have the right to make such protective and other advances as it deems necessary or appropriate in order to protect or liquidate the DIP Collateral or to otherwise enhance the recovery from the DIP Collateral (the "**Protective Advances**"), the repayment of which Protective Advances shall become part of the DIP Obligations under the DIP Facility Documents; provided however, that CCV shall have no obligation under the DIP Facility Documents or the Prepetition Credit Agreement to make any such Protective Advances.

(3)     If the DIP Lender exercises any of its rights and remedies upon the entry of a Default Order and entry of an order of the Court in respect of and granting the DIP Lender relief from stay, then the DIP Lender may retain one or more agents to sell, lease, or otherwise dispose of the DIP Collateral.  In any exercise of its rights and remedies upon a Default, the DIP Lender is authorized to proceed under and subject to the DIP Facility Documents.  All proceeds realized from any of the foregoing shall be

turned over to the DIP Lender for application to the DIP Obligations in accordance with the provisions of this Order.

(4)     Nothing included herein shall prejudice, impair, or otherwise affect the rights of the DIP Lender during an Enforcement Action to seek any other or supplemental relief in respect of the Debtors nor the DIP Lender's rights, as provided in the DIP Facility Documents, or to suspend or terminate the making of loans, advances, or fund Draw Requests under the DIP Facility Documents following the entry of a Default Order.

3.     **DIP Facility Documents and DIP Protections.**

(a)     **Approval of Entry Into DIP Facility Documents.**  The terms and conditions of the DIP Facility Documents are approved and incorporated by reference into this Order.  The Debtors and all other relevant parties are expressly and immediately authorized, empowered and directed (i) to execute and deliver to DIP Lender the DIP Facility Documents, (ii) to consummate the transactions described therein and incur and perform the DIP Obligations in accordance with, and subject to, the terms of this Order and the DIP Facility Documents, and (iii) to execute and deliver all instruments and documents which reasonably may be required or necessary for the performance by the Debtors under the DIP Facility and the creation and perfection of the DIP Liens.  The Debtors are authorized to perform all acts, pay the principal, interest, fees, expenses and other amounts described in the DIP Facility Documents as such become due.  The DIP Facility Documents represent valid and binding obligations of the Debtors enforceable against the Debtors in accordance with their terms.  If there is a conflict between the terms of this Order and the terms of the DIP Facility Documents, the terms of this Order govern.

(b)     **Authorization to Borrow.**  In order to enable the Debtors to complete construction of the Artecity Project and continue to operate their business, the Debtors are authorized to borrow up to the maximum amount of the DIP Facility in accordance with DIP Facility Documents and the Budget.  Notwithstanding any provision of its certificate or articles of incorporation, bylaws, operating agreement, partnership agreement, membership

#456828 v5

agreement, certificate of formation, certificate of limited partnership, regulations, or comparable

governing documents to the contrary, each Debtor is authorized to, and each officer, member,

manager, partner, or other comparable authorized signatory of each Debtor is authorized to cause

such Debtor to, jointly and severally guarantee and pay the DIP Obligations of each other Debtor

obligated under the DIP Facility Documents, and pledge, mortgage and grant security interests in

its assets to secure such DIP Obligations, and to execute and enter into any and all of the DIP

Facility Documents and all other documents and transactions necessary to implement and

effectuate the terms of the DIP Facility and the DIP Facility Documents.

(c)     **Application of DIP Proceeds**.  The proceeds of the DIP Facility (net of

any amounts used to pay fees, costs and expenses under the DIP Facility Documents) shall be

used, in each case in a manner consistent with the terms and conditions of the DIP Facility

Documents, and in accordance with the Budget, subject to the Permitted Budget Variance, solely

for the purposes set forth in the Budget.

(d)     **Conditions Precedent**.  The DIP Lender shall have no obligation to fund

any Draw Requests under the DIP Facility Documents unless the conditions precedent to funding

such requests have been satisfied in full or waived by the DIP Lender in its sole discretion.

(e)     **Grant of DIP Liens**.  Effective two business days after the entry of this

Order, the DIP Lender is granted, pursuant to subsections 364(c)(2), (c)(3), and 364(d) of the

Bankruptcy Code (i) first priority liens on and first priority senior security interests in favor of

DIP Lender in all now owned and hereafter acquired property of each Debtor that is not

encumbered by any liens; (ii) a first priority lien and security interest, pursuant to section

364(c)(3) of the Bankruptcy Code, on all tangible and intangible assets and property of the

Debtors that are not encumbered by Prepetition Liens and Prepetition Security Interests in favor

of CCV; and (iii) priming first priority liens on and priming first priority security interests in favor of DIP Lender in all property of Debtors that is subject to any Prepetition Liens and Prepetition Security Interests in favor of CCV. To secure the DIP Obligations, the Debtors grant the DIP Liens and DIP Security Interests in the following property of the Debtors:

(i)     all real property and improvements, whether now owned or hereafter acquired;

(ii)     all tangible and intangible assets, proceeds, cash collateral or any other property of the Debtors whatsoever, payment guarantees from each Guarantor; and collateral assignment of all material leases, contracts, licenses and permits;

(iii)     all other goods and personal property of the Debtors, whether tangible or intangible and wherever located, including money, cash, cash equivalents or other assets of the Debtors that now or hereafter come into the possession, custody, or control of the DIP Lender;

(iv)     all present and future rights, titles, and interests the Debtors may now have or be or become entitled to under or by virtue of any licenses, consents, permits, franchises, variances, certifications and approvals of governmental agencies and all other similar tangible and intangible property of the Debtors and the proceeds thereof; and

(v)     the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing;

(collectively, the "**DIP Collateral**"). DIP Liens and DIP Security Interests in the DIP Collateral shall be cross-collateralized and cross-defaulted as to all of the DIP Collateral. Notwithstanding anything herein to the contrary, the DIP Liens and DIP Security Interests shall at all times be subject to the Carve-Out. For avoidance of doubt, the DIP Collateral securing the DIP Facility shall exclude any and all Avoidance Actions. The DIP Collateral does not include the proceeds of the prepetition unsecured loan by interest holders of Artecity Holding Ltd. in Artecity Management LLC's account in the approximate amount of $52,000.00

#456828 v5

(f)    **DIP Lien and DIP Security Interests Priority**.  Except as set forth in this Order, the DIP Liens and DIP Security Interests shall be priming and senior in priority and shall not be made subject to, or *pari passu* with any lien or security interest that arose prior to the Petition Date by any court order heretofore or hereafter entered in these Chapter 11 cases and shall be valid and enforceable against any trustee or examiner appointed in these Chapter 11 cases, upon the conversion of these Chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "**Successor Cases**"), and/or upon the dismissal of these Chapter 11 cases; provided, however, that this provision shall not apply to any bankruptcy case filed by one or more of the Debtors in the future after the closing of these Chapter 11 Cases or any related chapter 7 case.  The DIP Liens shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

(g)    **Enforceable Obligations**.  The DIP Facility Documents shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto and their creditors, in accordance with their terms.

(h)    **Protection of DIP Lender and Other Rights**.  From and after entry of this Order, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Facility Documents and this Order and in strict compliance with the Budget, subject to the Permitted Budget Variance, as limited pursuant to the terms hereof.

(i)    **Super-Priority Administrative Claim Status**.  Except with respect to the Carve-Out, all DIP Obligations shall be granted an allowed super priority administrative expense claim (the "**DIP Super-Priority Claim**" and, together with the DIP Liens, the "**DIP**

#456828 v5

**Protections**") with priority in these Chapter 11 cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code. No costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to or *pari passu* with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lender arising under the DIP Facility Documents or this Order, except the Carve-Out.

4.      **Authorization to Use Proceeds of DIP Facility**.  Pursuant to the terms and conditions of this Order, the DIP Facility and the DIP Facility Documents, and in accordance with the Budget, subject to the Permitted Budget Variance, the Debtors are authorized to use the funds advanced under the DIP Facility Documents during the period commencing immediately after the entry of this Order and terminating upon the Maturity Date. Nothing in this Order shall authorize the disposition of any DIP Collateral outside the ordinary course of business or other proceeds resulting there from, except as permitted in the DIP Facility Documents and in accordance with the Budget, subject to further order of the Court.

5.      **Postpetition Lien Perfection.**  This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document

which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens, or to entitle the DIP Lender to the priorities granted herein.  Notwithstanding the foregoing, the Debtors and the DIP Lender are authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Lender shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge or dispute or subordination, at the time and on the date of entry of this Order.  Upon the request of the DIP Lender, without any further consent of any party, each Debtor is authorized to take, execute, deliver and file such instruments (in each case without representation or warranty of any kind) to enable the DIP Lender to further validate, perfect, preserve and enforce the DIP Liens and claims.  The Debtors shall execute and deliver to the DIP Lender all such agreements, financing statements, instruments and other documents as the DIP Lender may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens and claims.  All such documents will be deemed to have been recorded and filed as of the Petition Date.  A certified copy of this Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are authorized

to accept such certified copy of this Order for filing and recording. The DIP Lender, in its

discretion, may also file a photocopy of this Order as a financing statement with any recording

officer designated to file financing statements or with any registry of deeds or similar office in

any jurisdiction in which the Debtors have real or personal property, and in such event, the

subject filing or recording officer shall be authorized and is directed to file or record such copy

of this Order.

      6.     **Payment of Compensation**.  Nothing herein shall be construed as consent to the

allowance of, or create an obligation on the DIP Lender to pay, any professional fees or expenses

of the Debtors, any Committee or of any person or shall affect the right of the DIP Lender to

object to the allowance and payment of such fees and expenses or to permit the Debtors to pay

any such amounts not set forth in the Budget.  The DIP Lender reserves the right to object to any

request or application for the payment of professional fees that may be submitted or filed in these

Chapter 11 cases.

      7.     **Waiver of Section 506(c) Claims**.  No costs or expenses of administration that

have been or may be incurred in these Chapter 11 cases at any time shall be charged against the

DIP Lender or the DIP Collateral or Prepetition Collateral.  Nothing contained in this Order shall

be deemed a consent by the DIP Lender to any charge, lien, assessment or claim against the DIP

Collateral or Prepetition Collateral under section 506(c) of the Bankruptcy Code or otherwise,

and the DIP Lender reserves all rights in connection therewith.

      8.     **Collateral Rights**.  Unless the DIP Lender has provided its prior, written consent

or all the DIP Obligations have been paid in full in cash, or will be paid in full in cash upon entry

of an order approving the DIP Obligations, there shall not be entered in these proceedings, or in

any Successor Case, any order that authorizes any of the following:

(a)    Except as permitted in the DIP Facility Documents, the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral which is equal or senior to those granted to the DIP Lender and which is granted administrative status equal or *pari passu* to the DIP Super-Priority Claim;

(b)    Relief from stay by any person other than the DIP Lender with respect to the foreclosure on all or any portion of the DIP Collateral unless the DIP Lender also is given relief from the stay; provided however, that this provision shall not prohibit any party in interest from seeking stay relief or impair the ability of any party in interest to obtain stay relief; or

(c)    The Debtor's abandonment of DIP Collateral, except as permitted in the DIP Facility Documents.

9.    **Application of Proceeds**.

(a)    **Sale or Disposition/ Pre-Event of Default/Exercise of Remedies**.  As set forth in the DIP Facility Documents, all net proceeds of the sale or other disposition of any DIP Collateral, prior to the entry of a Default Order, shall be paid to the DIP Lender in accordance with the provisions of the DIP Facility Documents and this Order.

(b)    **Post-Event of Default/Exercise of Remedies**.  After the commencement of an Enforcement Action (as defined herein) by the DIP Lender following occurrence of an Event of Default under any of the DIP Facility Documents or this Order, any and all proceeds of DIP Collateral shall be applied in the following order:  (i) first, to pay fees, costs and expenses (including attorneys' and paralegals' fees) incurred by the DIP Lender in enforcing the DIP Facility Documents until paid in full; (ii) second, to pay any Protective Advances (as defined

below) until paid in full; and (iii) third, to pay the remaining DIP Obligations due and payable to the DIP Lender under the DIP Facility Documents until paid in full.

(c) **Enforcement Action**. As used in this Order and subject to the terms and provisions of the DIP Facility Documents, the term "**Enforcement Action**" shall mean (i) any action to foreclose a lien as to any DIP Collateral, (ii) any action to take possession of, or sell, or otherwise realize upon, or to exercise any other secured creditor rights or remedies with respect to, any DIP Collateral, including a sale or other disposition after the entry of a Default Order, (iii) taking of any other actions against any DIP Collateral, including the taking of control or possession of, or the exercise of any right of setoff with respect to, any DIP Collateral, (iv) the filing of a lawsuit to collect or to require performance owed by the Debtors, (v) the commencement of any legal proceedings or actions against or with respect to the Debtors or any of their property or assets or any Collateral after the commencement of these Chapter 11 cases, including the seeking of relief from the automatic stay or from any other stay in these Chapter 11 cases, the conversion of these Chapter 11 cases to a case or cases under Chapter 7 of the Bankruptcy Code, the dismissal of these Chapter 11 cases under section 1112 of the Bankruptcy Code, the appointment of a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or of a responsible officer or any examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(d) of the Bankruptcy Code, or (vi) the termination of any obligation to fund Draw Requests under the DIP Facility Documents as a result of the entry of a Default Order.

10. **Payment of Postpetition Interest**. The Debtors are authorized to pay, and the DIP Lender is entitled to receive, any and all interest and fees under the DIP Facility.

11.    **Disposition of DIP Collateral**.  Except as set forth below or provided in a further order of the Court, entered after notice to the DIP Lender and a hearing, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, without the prior, written consent of the DIP Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lender or an order of this Court). Notwithstanding the foregoing, in any sale of the DIP Collateral under section 363(f) of the Bankruptcy Code or under the terms of any plan of reorganization, the DIP Lender shall be entitled to credit bid all or a part of the DIP Obligations and Prepetition Indebtedness.  The Debtor shall not object to, seek to impair, or otherwise interfere with the DIP Lenders right to credit bid such obligations and indebtedness so long as the determination of the credit bid is consistent with the Bankruptcy Code.

12.    **Other Rights and Obligations.**

(a)    **Good Faith Under Section 364(e) of the Bankruptcy Code.  No Modification or Stay of this Order**.  The DIP Lender has acted in good faith in connection with this Order and its reliance on this Order is in good faith.  Based on the findings set forth in this Order and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are modified, stayed, amended or vacated by a subsequent order of this or any other Court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, stay, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or the liens or priority authorized or created by this Order.  Notwithstanding any such modification, amendment or vacation, any claim or lien granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections granted to the DIP Lender shall be

#456828 v5

31

governed in all respects by the original provisions of this Order, and the DIP Lender shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim or lien.  Since the loans made pursuant to the DIP Facility Documents are made in reliance on this Order, the obligations owed to the DIP Lender prior to the effective date of any stay, modification or vacation of this Order cannot, as a result of any subsequent order in these Chapter 11 cases or in any Successor Cases, be subordinated, lose their lien priority or super priority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender under this Order and/or the DIP Facility Documents.

(b)    **Modification of Stay**.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is modified to the extent necessary to implement the DIP Facility Documents and this Order, including, without limitation to (1) permit the Debtors to grant the DIP Liens and DIP Security Interests and to incur all liabilities and obligations to the DIP Lender under the DIP Facility Documents, the DIP Facility and this Order, and (2) authorize the DIP Lender to retain and apply payments hereunder in accordance with the provisions of this Order.

(c)    **Reporting Requirements.**  The Debtors shall produce and deliver to the DIP Lender reports containing financial information that is satisfactory in form and substance to the DIP Lender on a bi-weekly basis.

(d)    **Proofs of Claim**.  The DIP Lender may, but is not required to file proofs of claim in these Chapter 11 cases or any Successor Case, provided however, that nothing in this Order shall or is intended to modify or change the requirements under the Bankruptcy Code for the filing of a proof of claim in a chapter 7 bankruptcy proceeding.

#456828 v5

32

(e)    **Other Debtor Obligations.** The Debtors shall (i) provide copies of all professional, contractor, and subcontractor contracts or other evidence of agreements between them to CCV no later than Friday, September 11, 2010; (ii) pay all real estate taxes, utilities and other expenses associated with the Artecity Project as set forth in the Budget, provided, however, real estate taxes of a unit shall be paid at closing as an ordinary and necessary expense of closing the sale of the unit; and provided, further, however, that payment of real estate taxes shall be prorated for the current year; (iii) obtain all ordinary and necessary guaranties and warranties from any and all subcontractors; (iv) permit CCV, its consultant, or any representative, reasonable access to the Artecity Project; (v) promptly comply with all reasonable requests for information concerning the status of the construction or otherwise of the Artecity Project, including, without limit, to provide copies of sales contracts, schedules of sales, closings, and other information of similar nature; and (vi) comply with the applicable provisions of the Prepetition Loan Documents, as they relate to conditions precedent to any loan disbursement, the budget, construction, change orders, and sale of units, as more specifically set forth in the DIP Facility Documents except to the extent the Debtors complied with such provisions prepetition and such provisions are not inconsistent with the terms of this Order and the Bankruptcy Code.

(f)    **Binding Effect.** The provisions of this Order shall be binding upon and inure to the benefit of the DIP Lender, the Debtors, and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of any of the Debtors) whether in these Chapter 11 cases, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 Case.

#456828 v5

(g) **Effect of Order**. Nothing in this Order alters or should be deemed to alter the requirements for filing, soliciting or confirming a plan under the single asset real estate provisions of the Bankruptcy Code, or shall be deemed to extend the deadlines set forth in section 362(d)(3) of the Bankruptcy Code, as applicable pursuant to this Court's Order dated August 31, 2010 (D.E. 94).

(h) **No Waiver**. The failure of the DIP Lender to seek relief or otherwise exercise its rights and remedies under the DIP Facility Documents, the DIP Facility, this Order or otherwise, as applicable, shall not constitute a waiver of any of the DIP Lender's rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the rights of the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including without limitation, (i) the rights of the DIP Lender to (a) request conversion of any of these Chapter 11 cases to a case under Chapter 7, dismissal of any of these Chapter 11 cases, or the appointment of a trustee in any of these Chapter 11 cases, or (b) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a plan or (ii) enforce any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender.

(i) **No Third-Party Rights**. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(j) **No Marshaling**. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(k) **Section 552(b)**. The DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.

#456828 v5

34

(l)  **Protection of DIP Collateral and DIP Liens**.  The Debtors shall maintain adequate builders' risk, liability, and comprehensive insurance coverage, in amounts not less than the amounts set forth in the Prepetition Loan Documents or $25 million in coverage in place once the Initial Draw Request is funded, with CCV listed as an additional insured.  The Debtor shall provide to the DIP Lender endorsements of insurance policies insuring all or any part of the DIP Collateral and each insurer shall cooperate to provide to DIP Lender all such endorsements of existing insurance policies providing for DIP Lender to be primary loss payee under any such policies.

(m)  **Preservation of DIP Liens**.  No claim or lien having a priority superior to or *pari passu* with those granted by this Order to the DIP Lender shall be granted or allowed while any portion of the DIP Obligations remain outstanding, and the DIP Liens and DIP Security Interests shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under Bankruptcy Code section 551, or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under Bankruptcy Code section 364(d) or otherwise.

(n)  **Amendment**.  The Debtors and the DIP Lender may amend or waive any provision of the DIP Facility Documents, provided that such amendment or waiver, in the judgment of the DIP Lender, is either non-prejudicial to the rights of third parties or is not material.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by or on behalf of the Debtors and the DIP Lender (after having obtained the approval of the DIP Lender as provided in the DIP Facility Documents) and approved by the Court.

(o) **Survival of Order, Expiration of the Order**. The provisions of this

Order (including without limitation, the DIP Protections and all DIP Liens granted hereunder)

and any actions taken pursuant hereto shall be effective two business days after the entry hereof

and shall survive entry of any order which may be entered (i) confirming any plan in any of these

Chapter 11 cases, (ii) converting any of these Chapter 11 cases to a case under chapter 7 of the

Bankruptcy Code, (iii) dismissing any of these Chapter 11 cases, (iv) withdrawing of the

reference of any of these Chapter 11 cases from this Court, or (v) providing for abstention from

handling or retaining of jurisdiction of any of these Chapter 11 cases in this Court. The terms

and provisions of this Order, including the DIP Protections granted pursuant to this Order, and

the DIP Facility Documents, shall continue in full force and effect notwithstanding the entry of

such order, and such DIP Protections shall maintain their priority as provided by this Order until

all the obligations of the Debtors to the DIP Lender pursuant to the DIP Facility Documents

pursuant to this Order have been indefeasibly paid in full and discharged (such payment being

without prejudice to any terms or provisions contained in the DIP Facility or this Order which

survive such discharge by their terms). The DIP Obligations shall not be discharged by the entry

of an order confirming any Plan, the Debtors having waived such discharge pursuant to section

1141(d)(4) of the Bankruptcy Code. The Debtors shall not propose or support any plan that is

not conditioned upon the payment in full in cash of all of the DIP Obligations, on or prior to the

earlier to occur of (i) the effective date of any such plan, (ii) the Maturity Date, or (iii) the entry

of a Default Order. If an order dismissing any of these Chapter 11 cases under Bankruptcy Code

section 1112 or otherwise is at any time entered, such order shall provide (in accordance with

Bankruptcy Code sections 105 and 349) that (i) the superpriority claims, priming liens, and

security interests granted to the DIP Lender pursuant to this Order and the DIP Facility

Documents shall continue in full force and effect and shall maintain their priorities as provided in this Order and DIP Facility Documents until all DIP Obligations shall have been indefeasibly paid in cash in full (or, with respect to the DIP Obligations, otherwise satisfied in a manner agreed to by the DIP Lender) and that such superpriority claims and priming liens, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above. For avoidance of doubt, this provision shall not apply to any bankruptcy case filed by one or more of the Debtors in the future after the closing of these Chapter 11 Cases or a related chapter 7 case.

(p)    **Inconsistency**. In the event of any inconsistency between the terms and conditions of the DIP Facility Documents and of this Order, the provisions of this Order shall govern and control.

(q)    **Enforceability**. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon execution and entry on the docket hereof.

(r)    **Objections Overruled**. All objections to the entry of this Order that have not been withdrawn or resolved are overruled.

(s)    **No Waivers or Modification of Order**. The Debtors irrevocably waive any right to seek any modification or extension of this Order without the prior written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

13.    **Retention of Jurisdiction**.  This Court has and will retain jurisdiction to enforce this Order according to its terms.

14.    **No Consolidation**.  Nothing in this Order shall constitute or be deemed to constitute a substantive consolidation of the bankruptcy estates of the Debtors.

15.    **Effective Two Business Days After Entry**.  This Order shall be effective two business days after it is entered.

16.    In the event of Hurricane or other act of God, the Court may allow for cause shown a reasonable time to comply with an operational deadline after the Hurricane or other act of God, but in no event longer than thirty (30) days after the expiration of such deadline.

###

Submitted by:
Thomas R. Lehman, P.A.
LEVINE KELLOGG LEHMAN SCHNEIDER & GROSSMAN LLP
Miami Center – 34th Floor
201 South Biscayne Blvd.
Miami, Florida 33131-4301
 Telephone: 305.403.8788
Facsimile: 305.403.8789
E-Mail: trl@LKLlaw.com


Copies to:
Thomas R. Lehman, P.A., (Attorney Lehman shall serve a copy of this Order on all interested parties upon receipt and shall file a Certificate of Service indicating same.)

# EXHIBIT A
# BUDGET

# ARTECITY PROJECT

### Hard Costs & General Conditions & Soft Costs to finish the two towers North and South

| SUMMARY HARD COSTS & GENERAL CONDITION | CASH FLOW HARD COSTS & GENERAL CONDITION | | | |
|---|---|---|---|---|---|
| | | FIRST MONTH | SECOND MONTH | THIRD MONTH | FOURTH MONTH |
| General Conditions | $ 518,189.08 | $ 268,089.08 | $ 102,700.00 | $ 79,200.00 | $ 68,200.00 |
| South Tower | $ 561,352.39 | $ 184,216.39 | $ 299,038.00 | $ 46,098.00 | $ 30,000.00 |
| North Tower | $ 386,381.69 | $ 141,552.36 | $ 200,379.33 | $ 44,450.00 | $ - |
| TOTAL | $ 1,465,923.16 | $ 593,857.83 | $ 602,117.33 | $ 171,748.00 | $ 98,200.00 |

| SUMMARY SOFT COSTS | CASH FLOW SOFT COSTS | | | | | |
|---|---|---|---|---|---|---|---|
| | | FIRST MONTH | SECOND MONTH | THIRD MONTH | FOURTH MONTH | FIFTH MONTH | SIXTH MONTH |
| Artecity Governor | $ 90,639.06 | $ 15,106.51 | $ 15,106.51 | $ 15,106.51 | $ 15,106.51 | $ 15,106.51 | $ 15,106.51 |
| Park Villas Development | $ 69,842.94 | $ 11,640.49 | $ 11,640.49 | $ 11,640.49 | $ 11,640.49 | $ 11,640.49 | $ 11,640.49 |
| Artecity Plaza | $ 69,842.88 | $ 11,640.48 | $ 11,640.48 | $ 11,640.48 | $ 11,640.48 | $ 11,640.48 | $ 11,640.48 |
| Artecity South Development | $ 120,842.94 | $ 20,140.49 | $ 20,140.49 | $ 20,140.49 | $ 20,140.49 | $ 20,140.49 | $ 20,140.49 |
| U.S.Trustee Fees | $ 11,158.00 | $ - | $ 4,658.00 | $ - | $ - | $ 6,500.00 | $ - |
| Artecity Park | $ 179,659.62 | $ 29,943.27 | $ 29,943.27 | $ 29,943.27 | $ 29,943.27 | $ 29,943.27 | $ 29,943.27 |
| TOTAL | $ 541,985.44 | $ 88,471.24 | $ 93,129.24 | $ 88,471.24 | $ 88,471.24 | $ 94,971.24 | $ 88,471.24 |

| CONTINGENCIES | $ 410,621.43 | | | | | | |
|---|---|---|---|---|---|---|---|
| TOTAL COSTS TO COMPLETION OF NORTH AND SOUTH TOWERS | $ 2,418,530.03 | $ 682,329.07 | $ 695,246.57 | $ 260,219.24 | $ 186,671.24 | $ 94,971.24 | $ 88,471.24 |

| Post Petition Pre-funding Expenses | $ 90,678.22 |
|---|---|
| Carve-out provision | $ 215,791.75 |
| Total D.I.P. Loan | $ 2,725,000.00 |

Artecity Budget HARD, GEN COND, SOFT 20100909

EXHIBIT "A"

# GENERAL CONDITIONS

| Item No. | Line Item Description | TOTAL COSTS | FIRST MONTH | CASH FLOW | | |
|---|---|---|---|---|---|---|
| | | | | SECOND MONTH | THIRD MONTH | FOURTH MONTH |
| DIV. 01 | GENERAL CONDITIONS | | | | | |
| 1.1 | Management: Zarif, Alfa, etc etc | $ 114,000.00 | $ 30,000.00 | $ 30,000.00 | $ 30,000.00 | $ 24,000.00 |
| 1.3 | Surveying | $ 15,000.00 | | $ 10,000.00 | $ 5,000.00 | |
| 1.4 | Temporary Facilities | $ 1,200.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 |
| 1.5 | Office Supplies & Expenses | $ 600.00 | $ 150.00 | $ 150.00 | $ 150.00 | $ 150.00 |
| 1.5.1 | Computer Support | $ 400.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 |
| 1.6 | Temp Telephone / Fax / DSL | $ 1,000.00 | $ 250.00 | $ 250.00 | $ 250.00 | $ 250.00 |
| 1.7 | Temp Utilities | $ 12,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 | $ 3,000.00 |
| 1.10 | General cleaning | $ 8,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 | $ 2,000.00 |
| 1.11 | Dumpster & Trash | $ 4,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 |
| 1.12 | First Aid / Safety | $ 400.00 | $ 100.00 | $ 100.00 | $ 100.00 | $ 100.00 |
| 1.13 | Safety Railings & Maintenance | $ 1,200.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 |
| 1.18 | Security | $ 16,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 |
| 1.19 | Blueprints/Permits | $ 5,000.00 | $ 2,500.00 | $ 2,500.00 | | |
| 1.20 | Consultants: ARQ, Fraga, Pirez, Jacomino | $ 126,000.00 | $ 31,500.00 | $ 31,500.00 | $ 31,500.00 | $ 31,500.00 |
| 1.20 | R2Construction | $ 6,000.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 |
| 1.30 | Liability Insurance | $ 16,000.00 | | $ 16,000.00 | | |
| 1.24 | Builder Risk (12 moths) | $ 191,389.08 | $ 191,389.08 | | | |
| | TOTAL GENERAL CONDITIONS | $ 518,189.08 | $ 268,089.08 | $ 102,700.00 | $ 79,200.00 | $ 68,200.00 |

General Conditions

## SOUTH TOWER SCOPE BREAKDOWN

| SCOPE OF WORK | CONTRACTOR | AMOUNT | FIRST MONTH | SECOND MONTH | THIRD MONTH | FOURTH MONTH |
|---|---|---|---|---|---|---|
| Final Grade & Landscaping | Buildtech Group Inc | $ 40,000.00 | | | $ 20,000.00 | $ 20,000.00 |
| Irrigation System | South Dades Finest I | $ 3,200.00 | | | $ 3,200.00 | |
| Deck & Terrace Patching and Final Coat | Buildtech Group Inc | $ 16,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 | $ 4,000.00 |
| Pending Exterior Railing & Fencing Work | Piloto Iron Works | $ 4,762.48 | $ 1,762.48 | $ 3,000.00 | | |
| Gates & Railings at Pool Deck | Piloto Iron Works | $ 7,019.91 | $ 2,019.91 | $ 2,500.00 | $ 2,500.00 | |
| Tiles Installation works | RPM & T Ent. | $ 23,520.00 | $ 13,520.00 | $ 7,000.00 | $ 3,000.00 | |
| Gym Flooring & Vinyl base | Buildtech Group Inc | $ 7,000.00 | $ 3,500.00 | $ 3,500.00 | | |
| Gym Bathroom Fixtures & Vanities | Buildtech Group Inc | $ 6,000.00 | $ 3,000.00 | $ 3,000.00 | | |
| Gym Mirrors | Buildtech Group Inc | $ 2,000.00 | | $ 2,000.00 | | |
| Gym Equipment | ?? | $ 16,000.00 | | $ 16,000.00 | | |
| Finish Carpet Trim in Hallways | Buildtech Group Inc | $ 3,600.00 | | $ 3,600.00 | | |
| Wood Base and Thresholds at Hallways | Roberts Carp | $ 11,410.00 | $ 2,410.00 | $ 7,000.00 | $ 2,000.00 | |
| Exterior Paint Touch-up | Buildtech Group Inc | $ 5,000.00 | | $ 5,000.00 | | |
| Interior Paint | Buildtech Group Inc | $ 4,000.00 | $ 1,000.00 | $ 3,000.00 | | |
| Misc. Roof Clean-up & punch-out | Buildtech Group Inc | $ 2,400.00 | | $ 2,400.00 | | |
| Misc. Concrete works | Buildtech Group Inc | $ 10,000.00 | $ 2,000.00 | $ 8,000.00 | | |
| Concrete | Adonel Concrete | $ 8,368.00 | $ 4,000.00 | $ 4,368.00 | | |
| Kitchen Cabinets, glass and Hoods | Roberts Carp | $ 15,766.00 | $ 2,000.00 | $ 8,000.00 | $ 5,766.00 | |
| Install missing device | Roberts Carp | $ 3,420.00 | | $ 3,420.00 | | |
| Doors re-adjust | Roberts Carp | $ 4,000.00 | $ 2,000.00 | $ 2,000.00 | | |
| Final Appliance Installation | Buildtech Group Inc | $ 2,000.00 | | $ 2,000.00 | | |
| Pressure Clean Garage | Buildtech Group Inc | $ 1,600.00 | | | $ 1,600.00 | |
| Garage Rolling Doors | Buildtech Group Inc | $ 20,000.00 | | $ 20,000.00 | | |
| Flood Barriers | Buildtech Group Inc | $ 7,600.00 | $ 7,600.00 | | | |
| Pool Inspection & Final | Pool Tech | $ 9,432.00 | | $ 7,000.00 | $ 2,432.00 | |
| Pool Electr works | Manuel Barcelo Elec | $ 3,500.00 | $ 1,000.00 | $ 2,500.00 | | |
| Shower Glass Panels | Buildtech Group Inc | $ 2,000.00 | | $ 2,000.00 | | |
| Unit Punch-out | Buildtech Group Inc | $ 5,200.00 | | $ 2,600.00 | $ 2,600.00 | |
| Roof Spa Punch-out | Buildtech Group Inc | $ 2,000.00 | | $ 1,000.00 | $ 1,000.00 | |
| Final Clean All Areas | Buildtech Group Inc | $ 6,000.00 | | | | $ 6,000.00 |

South Tower Hard

## SOUTH TOWER SCOPE BREAKDOWN

| SCOPE OF WORK | CONTRACTOR | AMOUNT | FIRST MONTH | CASH FLOW SECOND MONTH | THIRD MONTH | FOURTH MONTH |
|---|---|---|---|---|---|---|
| Tiles | Tropical Tiles | $ 11,921.00 | $ 11,921.00 | | | |
| Roofing | Prestige Roofing | $ 42,150.00 | $ 10,000.00 | 32,150.00 | | |
| Plumbing | Aurora Plumbing | $ 34,000.00 | $ 7,000.00 | 27,000.00 | | |
| Plumbing Fixture | Century Plumbing | $ 20,965.00 | 20,965.00 | | | |
| Mechanical | Barrios Mechanical | $ 55,000.00 | | $ 55,000.00 | | |
| Electrical & Fire Alarm | R & D Elect | $ 74,538.00 | 24,538.00 | 50,000.00 | | |
| Fire Sprinkler | Fix it Fire | $ 12,980.00 | 2,980.00 | 10,000.00 | | |
| Elevators | Otis Elevators | $ 57,000.00 | 57,000.00 | | | |
| TOTAL COSTS | | $ 561,352.39 | $ 184,216.39 | $ 299,038.00 | 48,098.00 | $ 30,000.00 |

South Tower Hard

| NORTH TOWER SCOPE BREAKDOWN | | | CASH FLOW | | | |
| --- | --- | --- | --- | --- | --- | --- |
| SCOPE OF WORK | CONTRACTOR | AMOUNT | FIRST MONTH | SECOND MONTH | THIRD MONTH | FOURTH MONTH |
| 21st Street Lighting | Buildtech Group Inc | $ 12,800.00 | | | $ 12,800.00 | |
| Deck Site & Landscaping Lighting | Buildtech Group Inc | $ 8,000.00 | $ 2,000.00 | $ 6,000.00 | | |
| Fire Pump Room Concrete Work | Buildtech Group Inc | $ 3,600.00 | $ 2,000.00 | $ 1,600.00 | | |
| Finish Pending Exterior Railing & pool dec | Ploto Iron Work | $ 33,554.36 | $ 3,554.36 | $ 15,000.00 | $ 15,000.00 | |
| Railings at Main North Entry | Ploto Iron Work | $ 970.33 | $ - | $ 970.33 | | |
| Finish Carpet Trim in Hallways | Buildtech Group Inc | $ 3,600.00 | $ 1,000.00 | $ 2,600.00 | | |
| Wood Base and Thresholds at Hallways | Robert Carpentry | $ 10,450.00 | $ 1,500.00 | $ 5,500.00 | $ 3,450.00 | |
| Elevator Tile Floors and Lobbies | RPM & T | $ 2,680.00 | $ 600.00 | $ 2,080.00 | | |
| Exterior Paint Touch-up | Buildtech Group Inc | $ 4,000.00 | | $ 2,000.00 | $ 2,000.00 | |
| Hood Installation | Robert Carpentry | $ 4,950.00 | | $ 2,950.00 | $ 2,000.00 | |
| Finishes in the kitchen | Robert Carpentry | $ 4,275.00 | $ 1,275.00 | $ 3,000.00 | | |
| Shower Glass Panels | Buildtech Group Inc | $ 1,600.00 | | $ 1,600.00 | | |
| Misc. Roof Clean-up & punch-out | Buildtech Group Inc | $ 2,800.00 | | $ 2,800.00 | | |
| Misc. Concrete works | Buildtech Group Inc | $ 2,800.00 | $ 1,000.00 | $ 1,800.00 | | |
| Deck & Terrace Patching and Final Coat. | Buildtech Group Inc | $ 13,200.00 | $ 2,000.00 | $ 8,000.00 | $ 3,200.00 | |
| Install Kitchen Hoods Cover and Trim | Buildtech Group Inc | $ 6,000.00 | $ 3,000.00 | $ 3,000.00 | | |
| Final Appliance Installation / Adjustments | Buildtech Group Inc | $ 2,000.00 | $ 2,000.00 | | | |
| Roof Spa Punch-out | Buildtech Group Inc | $ 2,000.00 | | $ 2,000.00 | | |
| Unit Punch-out | Buildtech Group Inc | $ 5,200.00 | $ 1,200.00 | $ 4,000.00 | | |
| Final Clean All Areas | Buildtech Group Inc | $ 6,000.00 | | | $ 6,000.00 | |
| Irrigation | South Dades Finest Irr | $ 10,750.00 | $ 2,750.00 | $ 8,000.00 | | |
| Roofing | Prestige Roofing | $ 42,150.00 | $ 12,150.00 | $ 30,000.00 | | |
| Plumbing | Aurora Plumbing | $ 6,500.00 | | $ 6,500.00 | | |
| Mechanical | Barrios Mechanical | $ 45,000.00 | $ 15,000.00 | $ 30,000.00 | | |
| Electrical & Fire Alarm | R & D Electric | $ 77,028.00 | $ 27,028.00 | $ 50,000.00 | | |
| Fire Sprinkler | Fix it Fire | $ 12,979.00 | $ 2,000.00 | $ 10,979.00 | | |
| Elevators | Otis Elevators | $ 61,495.00 | $ 61,495.00 | $ - | | |
| TOTAL COSTS | | $ 386,381.69 | $ 141,552.36 | $ 200,379.33 | $ 44,450.00 | $ - |

North Tower Hard

| Artecity Governor LLC | Memo | Amount |
|---|---|---|
| G | Artecity Governor Condominium Association | Maintenance Fees for Unsold Units | $ | 4,354.35 |
| G | Artecity Park Master Assoc. | Maintenance Fees Master Assn for Unsold Units | $ | 2,392.16 |
| G | FPL | Unsold units (unrented) and offices | $ | 200.00 |
| G | Lorena Orozco | Cleaning Service for 3 Offices | $ | 260.00 |
| G | Petty Cash | Petty cash for Miscellanies | $ | 900.00 |
| G | Piero Salussolia, P.A. | Prof. Legal Serv. | $ | 1,000.00 |
| G | Sunny Houses Cons LLc | Management Services | $ | 3,000.00 |
| G | European Advisors Inc. | Professional conulting fees | $ | 3,000.00 |
| | | | | |
| | TOTAL | | $ | 15,106.51 |

## Park Villas Development LLC

| | Memo | Amount |
|---|---|---|
| Artecity Park Master Condo Association | Deficit Funding | $ 2,840.49 |
| Berman Rennert Vogel & Mandler,P.A | Prof. Legal Serv. | $ 1,000.00 |
| Piero Salussolia, P.A. | Prof. Legal Serv. | $ 1,000.00 |
| Sunny Houses Cons LLc | Management Services | $ 3,000.00 |
| European Advisors Inc. | Professional conulting fees | $ 3,000.00 |
| Utilities water | Account#519450 & 51 | $ 800.00 |
| | | |
| **Total** | | $ 11,640.49 |

Villas Soft

Page 7

## Artecity Plaza LLC

| | | Memo | Amount |
|---|---|---|---|
| PL | Artecity Park Master Condo Association | Deficit Funding | $ 2,840.48 |
| PL | Piero Salussolia, P.A. | Prof. Legal Serv. | $ 1,000.00 |
| PL | Sunny Houses Cons LLc | Management Services | $ 3,000.00 |
| PL | European Advisors Inc. | Professional conulting fees | $ 3,000.00 |
| PL | Berman Rennert Vogel & Mandler,P.A | Prof. Legal Serv. | $ 1,000.00 |
| PL | City of Miami Beach | Account#519784-00 | $ 800.00 |
| | | | |
| | **Total** | | $ 11,640.48 |

Plaza Soft

| Artepark South Development LLC | Memo | | Amount |
|---|---|---|---|
| $ Artecity Park Master Condo Association | Deficit Funding Request | $ | 2,840.49 |
| $ AT&T Office job site | Account#30553185S8001 | $ | 500.00 |
| $ Piero Salussolia, P.A. | Prof. Legal Serv. | $ | 1,000.00 |
| $ SunnyHouses Cons LC | Management Services | $ | 4,500.00 |
| $ European Advisors Inc. | Professional conulting fees | $ | 4,500.00 |
| $ City of Miami Beach | Account#511392-00 | $ | 800.00 |
| $ F.P.L.-Units | Several Accounts | $ | 3,500.00 |
| $ Berman Rennert Vogel & Mandler,P.A | Professional legal fees | $ | 2,500.00 |
| | | | |
| TOTAL | | $ | 20,140.49 |

South Tower Soft

| Artecity Park LLC (North Tower) | Memo | Amount |
|---|---|---|
| N | Peti Cash | Account# 3783-479594-46005 | $ 900.00 |
| N | Artecity Park Master Condo Association | Deficit Funding Request | $ 2,840.49 |
| N | SunnyHouses Cons LC | Management Services | $ 4,500.00 |
| N | European Advisors Inc. | Professional conulting fees | $ 4,500.00 |
| N | Piero Salussolia, P.A. | Prof. Legal Serv. Rend | $ 1,000.00 |
| N | Jeanie Osendi | Payroll W/E | $ 1,280.00 |
| N | Jeanie Osendi | Payroll W/E | $ 1,280.00 |
| N | Mary Di Pietro | Payroll W/E | $ 1,600.00 |
| N | Mary Di Pietro | Payroll W/E | $ 1,600.00 |
| N | Lorena Orozco | Payroll W/E | $ 960.00 |
| N | Lorena Orozco | Payroll W/E | $ 960.00 |
| N | Orestes Ramos | Payroll W/E | $ 1,200.00 |
| N | Orestes Ramos | Payroll W/E | $ 1,200.00 |
| N | IRS | Payroll Taxes - SS & MED Company W/E | $ 424.58 |
| N | IRS | Payroll Taxes - SS & MED Company W/E | $ 424.58 |
| N | AT&T | | $ 273.62 |
| N | F.P.L. | Account# 2660264405 | $ 500.00 |
| N | F.P.L.-Units | Several Accounts | $ 3,500.00 |
| N | Berman Rennert Vogel & Mandler, P.A. | L & A | $ 1,000.00 |
| | Total | | $ 29,943.27 |

North Tower Soft

## POST PETITION PRE-FUNDING EXPENSES

| Vendor | Entity | Date of Service | Services | August 2010 | September 2010 |
|--------|--------|-----------------|----------|-------------|----------------|
| FPL Governor | Artecity Governor | 06/09/10-7/9/10 | Power | - | 250.00 |
| FPL North | Artecity Park | 06/09/10-7/9/10 | Power | - | 6,000.00 |
| FPL South | Artepark South | 06/09/10-7/9/10 | Power | - | 6,000.00 |
| City of Miami Beach | Artepark South | 6/11/10-7/13/10 | Water | - | 250.00 |
| City of Miami Beach | Artecity Plaza | 6/11/10-7/13/10 | Water | - | 600.00 |
| City of Miami Beach | Park Villas | 6/11/10-7/13/10 | Water | - | 1,300.00 |
| Builtech Group | Artecity Park/Artepark South | 5/07/10-5/27/10 | Security & Punshlist | 3,600.00 | |
| Builtech Group | Artecity Park/Artepark South | 6/07/10-6/25/10 | Security & Punshlist | 7,200.00 | |
| Builtech Group | Artecity Park/ Artepark South | 06/28/10-7/16/10 | Security & Punshlist | 3,600.00 | |
| Builtech Group | Artecity Park/Artepark South | 07/19/10-8/6/10 | Security & Punshlist | 3,600.00 | 7,200.00 |
| AT&T | Artepark South | 07/29/10-8/28/10 | Phone Services (Construction | 404.77 | 500.00 |
| AT&T | Artecity Park | 5/10/10-6/9/10 | Phone Services (Elevator phone) | 268.92 | 300.00 |
| AT&T | Artecity Park | 8/10/10-9/9/10 | Phone Services (Elevator phone) | 293.04 | 300.00 |
| AT&T | Artecity Governor | 7/16/10-8/15/10 | Phone Services (Office # 3) | 37.42 | 40.00 |
| Artecity Governor Condo Association | Artecity Governor | 7/15/2010 | Phone Service | 38.80 | 40.00 |
| Artecity Governor Condo Association | Artecity Governor | 08/01/10-08/31/10 | Maintenace Fees | 4,354.35 | 4,354.35 |
| Artecity Park Master Association | Artecity Governor | 08/01/10-08/31/10 | Maintenance Fees | 2,392.16 | 2,392.16 |
| Artecity Park Master Association | Artecity Park/ Artepark South/Park Villas/ | 7/1/10-7/31/10` | Deficit Funding Maintenance Fees | 11,036.75 | |
| Artecity Park Master Association | Artecity Park/Artepark South/Park Villas/ | 8/1/10-8/31/10 | Deficit Funding Maintenance Fees | 8,362.75 | 8,362.75 |
| Payroll | Artecity Park | 9/6/10 - 9/20/10 | Employees | | 7,600.00 |
| | | | | 45,188.96 | 45,489.26 |

# EXHIBIT B
# CARVE OUT SCHEDULE

#456828 v5

## CARVE OUT SCHEDULE

| Professionals | Role | Carve Out Amount |
|---|---|---|
| Levine Kellogg Lehman Schneider + Grossman LLP | Debtors' Bankruptcy Counsel | $200,000.00 |
| R$^2$ Construction Group, LLC | Debtors' Construction Advisor | $4,891.75 |
| Blazejack & Company | Debtors' Appraiser and Expert Witness | $10,900.00 |
| Total Carve Out | | $215,791.75 |

Carve Out Schedule



EXHIBIT
"B"