UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re                                                          Case No.: 10-31406-BKC-AJC

ARTECITY MANAGEMENT LLC *et al.*,[1]                Chapter 11 Proceeding
                                                                      Jointly Administered

      Debtors.

_____/

## THIRD AMENDED DISCLOSURE STATEMENT IN SUPPORT OF DEBTORS' THIRD AMENDED JOINT PLAN OF LIQUIDATION (CORRECTED)

      Artecity Management LLC, Artecity Holding, Ltd., Artecity Governor LLC, Artecity Park LLC, Artecity Plaza LLC, Artepark South Development LLC and Park Villas Development LLC (collectively, the "Debtors") hereby file their Third Amended Disclosure Statement in support of the Debtors' Third Amended Joint Plan of Liquidation.

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER & GROSSMAN LLP
*Attorneys for Debtors*
201 South Biscayne Blvd.
Miami Center – 34th Floor
Miami, Florida 33131-4301
Telephone: 305.403.8788
Facsimile: 305.403.8789

By:  /s/ Thomas R. Lehman
     Thomas R. Lehman, P.A.
     Florida Bar. No. 351318
     E-mail: trl@LKLlaw.com
     Jennifar M. Hill, Esq.
     Florida Bar No. 014382
     E-mail: jmh@LKLlaw.com

---

[1]    The last four digits of the taxpayer identification numbers for each of the Debtors follow in parentheses: (i) Artecity Management LLC (2357); (ii) Artecity Holding LTD (9763); (iii) Artecity Governor L.L.C. (3220); (iv) Artecity Park LLC (6068); (v) Artecity Plaza LLC (3734); (vi) Artepark South Development LLC (5232); and (vii) Park Villas Development LLC (5344).

**TABLE OF CONTENTS**

Section                                                                                                    Page

I.      INTRODUCTION AND SUMMARY ................................................................ 1
        A.      Overview of the Disclosure Statement ................................................ 1
        B.      Overview of the Plan ........................................................................ 2
        C.      Deadlines for Voting and Objecting; Date of Disclosure Statement and
                Plan Confirmation Hearing ............................................................... 2
        D.      Disclaimer ....................................................................................... 4
II.     HISTORICAL BACKGROUND; MANAGEMENT OF THE DEBTORS;
        REASONS FOR FILING CHAPTER 11 CASES ........................................... 4
        A.      History and Business of the Debtors .................................................. 4
        B.      Management/Employees and Insiders of the Debtors ........................... 6
        C.      Events Leading to Filing the Chapter 11 Cases .................................. 8
        D.      Pre-Petition Indebtedness ................................................................ 9
III.    THE CHAPTER 11 REORGANIZATION CASES ....................................... 11
        A.      Single Asset Real Estate Motion ..................................................... 11
        B.      Debtors' Motion to Obtain Credit .................................................... 11
        C.      Resolution of Pre-Petition Purchaser Deposit Claims Regarding Pre-petition,
                Preconsutruction Agreements for the Sale of Condominium Units in the
                North/South Towers and the Governor/Villas Buildings ...................... 12
        D.      Order Granting Limited Consolidation ............................................. 12
        E.      Debtors' Pending Claims and Potential Recoveries for Unsecured Creditors .... 13
        F.      CCV DIP Loan and CCV's Default Motion ....................................... 15
        G.      The Settlement Agreement ............................................................. 16
        H.      The 35 Qualified Sales Contracts .................................................... 17
        I.      Plan and Disclosure Statement ....................................................... 18
        J.      Claims Bar Date and Claims Objections ........................................... 19
        K.      Post-Petition Date Assets and Construction of the Artecity Project ....... 19
IV.     THE JOINT PLAN OF LIQUIDATION; TREATMENT OF CLAIMS AND
        EQUITY INTERESTS UNDER THE PLAN; MEANS OF IMPLEMENTING
        THE PLAN ............................................................................................ 20
        A.      Purpose ........................................................................................ 20
        B.      Treatment of Claims and Equity Interests Under the Plan ................... 20
        C.      Means of Implementing the Plan ..................................................... 27
        D.      Provisions Governing Distributions ................................................. 31
        E.      Plan Procedures for Resolving and Treating Disputed Claims .............. 32
        F.      Plan Provisions for Treatment of Executory Contracts and Unexpired Leases .. 33
        G.      Retained Causes of Action .............................................................. 34
        H.      Retention of Jurisdiction After the Effective Date ............................. 35
        I.      Conditions Precedent to Confirmation of the Plan ............................. 35
        J.      Conditions Precedent to the Effective Date of the Plan ....................... 35

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

K.    Exculpation ................................................................. 36
L.    Miscellaneous Plan Provisions .................................. 37
V.    VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION
OF THE PLAN ........................................................................ 38
A.    Classification of Claims and Equity Interests ............... 39
B.    Voting ........................................................................ 39
C.    Cramdown Provisions .................................................. 39
D.    Best Interests of Creditors .......................................... 40
E.    Feasibility of the Plan ................................................. 41
F.    Alternatives to the Plan ............................................... 41
G.    Risks Associated With Plan Confirmation .................... 41
VI.    DISCLAIMERS REGARDING TAX CONSEQUENCES ............... 41
A.    Disclaimer Regarding Tax Consequences of the Plan ...... 42
B.    Circular 230 Disclaimer .............................................. 42
VII.    RECOMMENDATION ................................................................. 42
VIII.    CONCLUSION ............................................................................ 42

### Exhibits to Disclosure Statement

Exhibit "1"    Debtors' Second Amended Joint Plan of Liquidation, including the attached Settlement Agreement and Bidding Procedures

Exhibit "2"    Description of Retained Causes of Action

Exhibit "3"    Debtors' Claims Analysis (the "Claims Analysis")

Exhibit "4"    Debtors' Distribution Analysis (the "Distribution Analysis")

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

## SECTION I
## INTRODUCTION AND SUMMARY

**A.**   <u>Overview of the Disclosure Statement</u>

     **1.**   **Introduction**

The Debtors are proposing, and have filed, their Third Amended Joint Plan of Liquidation (the "<u>Plan</u>") with the United States Bankruptcy Court for the Southern District of Florida (the "<u>Bankruptcy Court</u>").   A copy of the Plan is annexed as Exhibit "1" to this Disclosure Statement.   The Debtors hereby submit this Third Amended Disclosure Statement in support of the Plan (the "<u>Disclosure Statement</u>") pursuant to section 1125 of the United States Bankruptcy Code (the "<u>Bankruptcy Code</u>") in connection with solicitation of acceptances of the Plan from holders of Claims against the Debtors in Classes 2-5 under the Plan.

     **2.**   **Purpose of the Disclosure Statement**

This Disclosure Statement describes:

- The Debtors and significant events during the Debtors' Chapter 11 Bankruptcy Cases;
- How the Plan proposes to treat Claims or Equity Interests of the type you hold (*i.e.,* what you will receive on your Claim or Equity Interest if the Plan is confirmed);
- Who can vote on or object to the Plan;
- What factors the Bankruptcy Court will consider when deciding whether to confirm the Plan;
- Why the Debtors believe the Plan is feasible, and how the treatment of your Claim or Equity Interest under the Plan compares to what you would receive on your Claim or Equity Interest in liquidation; and
- The effect of confirmation of the Plan.

Be sure to read the Plan as well as the Disclosure Statement.  This Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

The information contained in the Disclosure Statement is based upon certain of the Debtors' records, court papers filed in the Bankruptcy Court, and the Debtors' opinions and conclusions. The information has not been subject to a certified audit.  The Debtors have made an effort to include complete and accurate information in this Disclosure Statement; however, the Debtors are unable to warrant or represent that this information is without any inaccuracy.

Capitalized terms used in this Disclosure Statement and not defined herein have the meanings assigned to them in the Plan (*see* Plan, Article I, "Definitions").   A reference in this Disclosure Statement to an "Article" refers to an Article of the Plan.

**B.**     <u>Overview of the Plan</u>

The Plan is a plan of liquidation and the product of the Settlement Agreement incorporated into the Plan between the Debtors and their secured lender, CCV, who has agreed to support confirmation of the Plan. The principal means of funding the Plan are proceeds of the sale of condominium units comprising the Artecity Project and a percentage of proceeds of potential litigation recoveries, if any, which will be collected and distributed to holders of Allowed Claims as set forth in the Plan. Administrative expenses and post-Effective Date litigation fees and expenses will be paid from portions of the Debtors' recoveries from Deposit Claim settlements.

The Court has entered an Order [D.E. 287] (the "<u>Limited Consolidation Order</u>") substantively consolidating the Debtors' estates for the limited purposes of claims administration and for voting on, confirmation of and making distributions under the Plan. Consequently, the all proofs of claim filed in the Debtors' Chapter 11 Cases are deemed proofs of claim filed in Artecity Holding Ltd.'s bankruptcy case, and all liabilities scheduled on the Debtors' schedules of assets and liabilities, unless scheduled as disputed, unliquidated or contingent, are deemed scheduled on Artecity Holding Ltd.'s schedules of assets and liabilities.

The Court has also entered an Order [D.E. 505] (the "<u>Junior Lien Avoidance Order</u>"), pursuant to which, all liens asserted against the Artecity Project junior to CCV's pre-petition liens shall be deemed extinguished, and all claims asserted as secured by the such junior liens shall be treated as unsecured claims. Certain notices of *lis pendens* recorded against the Artecity Project were discharged pursuant to the Junior Lien Avoidance Order.

Following are the Claims classified in the Plan:

| | |
|---|---|
| Class 1: | Election B Priority Deposit Claims |
| Class 2: | Secured Claim of Miami-Dade County for *Ad Valorem* Real Estate Taxes |
| Class 3: | Secured Claim of CCV |
| Class 4A: | Election A Secured Deposit Claims |
| Class 4B: | Election B Secured Deposit Claims |
| Class 5: | Allowed Unsecured Claims |
| Class 6: | Equity Interests |

For a more complete discussion of implementation of the Plan and the mechanics for Distributions under the Plan, see Articles VI and XI of the Plan.

**C.**     <u>Deadlines for Voting and Objecting; Date of Disclosure Statement Approval and Plan Confirmation Hearing</u>

The Bankruptcy Court has not yet confirmed the Plan described in this Disclosure Statement. This section of the Disclosure Statement describes the procedures pursuant to which the Plan will or will not be confirmed.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

1.    **Time and Place of the Hearing to Approve This Disclosure Statement and Confirm the Plan**

The Court will determine whether to approve this Disclosure Statement (the "Disclosure Statement Hearing") on June 29, 2011 at 3:00 p.m. at the United States Bankruptcy Court, 51 S.W. 1st Avenue, Miami, Florida 33130. At the Disclosure Statement Hearing, in accordance with section 1125 of the Bankruptcy Code, the Bankruptcy Court will consider whether the Disclosure Statement contains "adequate information" of a kind and in sufficient detail to enable a hypothetical reasonable creditor typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan.

The Court will also determine whether to confirm the Plan (the "Confirmation Hearing") on June 29, 2011 at 3:00 p.m. at the United States Bankruptcy Court, 51 S.W. 1st Avenue, Miami, Florida 33130.

2.    **Voting Instructions; Deadline for Voting to Accept or Reject the Plan**

Holders of Class 1 Election B Priority Deposit Claims are not Impaired and, therefore, Class 1 is deemed to have accepted the Plan. Holders of Class 6 Equity Interests will not retain any rights under the Plan on account of such interests and, therefore, Class 6 is deemed to have rejected the Plan. The Debtors' will not solicit votes from holders of Class 1 Creditors or Class 6 Equity Interest holders.

If you are the holder of a Claim in Class 2, 3, 4A, 4B or 5 and are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. Please vote and return your Ballot(s) to United States Bankruptcy Court, Clerk of Court, 51 S.W. 1st Avenue, Room 1510, Miami, Florida 33130 by 4:00 p.m. (Eastern Daylight Time) on or before June 20, 2011. In voting for the Plan, please only use the Ballot sent to you with this Disclosure Statement. If you receive more than one Ballot, you should assume that each Ballot is for a separate Claim and you should complete and return each of the Ballots.

Your ballot must be received by the Bankruptcy Court by 4:00 p.m. on June 20, 2011 or it will not be counted.

If a Claim is the subject of a timely objection or is scheduled by the Debtors as contingent, unliquidated, or disputed, the holder of the Claim is not entitled to vote on the Plan unless he or she has obtained an order of the Bankruptcy Court temporary allowing such Claim for the purpose of voting on the Plan. The deadline to file a request for the Court to estimate Claims for voting purposes is June 20, 2011 at 5:00 p.m.

If you are the holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot, or lost your Ballot, or if you have any questions about the Disclosure Statement, the Plan, or voting procedures, contact counsel for the Debtors by mail at Levine Kellogg Lehman Schneider + Grossman LLP, c/o Elsa Fresco, Miami Center – 34th Floor, 201 S. Biscayne Blvd., Miami, Florida 33131 or by phone at (305) 403-8788.

**3.     Deadline for Objecting to Approval of the Disclosure Statement and Confirmation of the Plan**

Objections to approval of the Disclosure Statement and/or confirmation of the Plan must be filed with the Court and served upon counsel for the Debtors, Levine Kellogg Lehman Schneider + Grossman LLP, c/o Thomas Lehman, P.A., Miami Center – 34th Floor, 201 S. Biscayne Blvd., Miami, Florida 33131, by June 24, 2011.

**D.     Disclaimer**

*The Court has not yet approved this Disclosure Statement as containing adequate information to enable the parties affected by the Plan to make an informed judgment about its terms. The Court has not yet determined whether the Plan meets the legal requirements for confirmation, and the fact that the Court has approved this Disclosure Statement does not constitute an endorsement of the Plan by the Court, or a recommendation that it be accepted. The Court's approval of this Disclosure Statement will be considered at the Disclosure Statement Hearing and consideration of confirmation of the Plan will be considered at the Confirmation Hearing. Both hearings will be at the same time. Objections to the adequacy of this Disclosure Statement must be filed on or before the date set forth in the Order accompanying this Disclosure Statement.*

**SECTION II**
**HISTORICAL BACKGROUND; MANAGEMENT OF**
**THE DEBTORS; REASONS FOR FILING CHAPTER 11 CASES**

**A.     History and Business of the Debtors**

The Debtors are engaged in the development of a real estate condominium project in Miami Beach, Florida, known as Artecity (the "Artecity Project"), located at 2100 Park Avenue, Miami Beach, Florida, on 21st Street, east of Washington Avenue and on the west border of Collins Park. Artecity Management, LLC ("Management") manages the Debtors' operations and is the general partner of Artecity Holding, Ltd. ("Holding") which, in turn, owns 100% of the membership interests in the following limited liability companies that own the real property and related personalty making up the Artecity Project: (i) Artecity Park LLC ("Park"); (ii) Artecity Plaza LLC ("Plaza"); (iii) Artecity Governor LLC ("Governor"); (iv) Artepark South Development LLC ("Artepark"); and (v) Park Villas Development LLC ("Park Villas").

The Artecity Project includes 202 condominium units in five multi-level buildings, together with retail spaces, two pools, a fitness and spa facility, and a parking garage. Prior to the Petition Date, the Debtors sold 43 units in the Governor Building. Since the Petition Date, the Debtors have entered into 35 pending contracts and renegotiated pre-petition contracts for the sale of condominium units located in the North and South Towers and the Park Villas Building (the "Qualified Sales Contracts"). The condominium units that are the subject of the Qualified Sales Contracts shall be referred to as the "Sold Units". Pursuant to the Plan, the Debtors have requested the Court to approve a bulk "as is" public sale (the "Auction" or "Sale") on June 29, 2011 at 3:00 p.m. of the Unsold Units (as such term is defined in the Plan). The

4

Successful Bidder at the Sale shall be assigned any Sold Units that are the subject of Qualified Sales Contracts that do not close two business days prior to the Sale and shall assume all of the Debtors' obligations under the Qualified Sales Contracts (including the Debtors' obligations to pay brokers' commissions and to use the Debtors' Closing Agent or buyers' closing agent as specified in the Qualified Sales Contracts), but will not assume statutory warranties or other obligations that would negate bulk assignee status under Florida's Distressed Condominium Relief Act.

The five buildings comprising the Artecity Project are as follows:

1.    Governor Building owned by Governor: Construction of this building is completed and a Certificate of Occupancy has been issued. Of the total 61 residential units available in the Governor Building, the sale of 43 condominium units were closed pre-petition, leaving 18 units remain unsold. The Debtors began renting the unsold Governor units in late 2009. The Sale of all residential and retail Unsold Units comprising the Governor Building will be free and clear of all claims and liens, with the exception of liens for *ad valorem* real estate taxes and four leases, two of which are for month-to-month terms, one of which expires on June 30, 2011 and one of which expires on August 31, 2011.

2.    South Tower owned by Artepark: Construction of the South Tower and the 58 residential condominium units therein was almost completed before the Petition Date. Construction resumed during October 2010 and was completed during December 2010, when the Debtors applied for a Certificate of Occupancy. The Debtors are currently working with the City of Miami Beach to obtain a Certificate of Occupancy for the South Tower and, upon receipt, they will begin promptly closing applicable Sold Units in accordance with the Court's Order [D.E. 281] (the "Sale Procedures Order"): (a) authorizing the Debtors to sell condominium units free and clear of liens, claims, interests and encumbrances; (b) establishing sale procedures for the post-petition sale of condominium units without further hearing; and (c) approving the form of agreements and addendums to be used in connection with the sale procedures. Unsold Units will be sold in bulk upon confirmation of the Plan and the successful bidder at the Sale shall be assigned the Sold Units that are the subject of unclosed Qualified Sales Contracts and shall assume the Debtors' obligations under the Qualified Sales Contracts.

3.    North Tower owned by Park: Construction of the North Tower and the 55 residential units therein was almost completed before the Petition Date. Construction resumed during October 2010 and was completed during December 2010, when the Debtors applied for a Certificate of Occupancy. The Debtors are currently working with the City of Miami Beach to obtain a Certificate of Occupancy for the North Tower and, upon receipt, they will begin promptly closing applicable Sold Units in accordance with the Sales Procedures Order. Unsold Units will be sold in bulk upon confirmation of the Plan, and the successful bidder at the Sale shall be assigned the Sold Units that are the subject of unclosed Qualified Sales Contracts and shall assume the Debtors' obligations under the Qualified Sales Contracts, but will not assume statutory warranties or other obligations that would negate bulk assignee status under Florida's Distressed Condominium Relief Act.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

4. <u>Park Villas Building owned by Park Villas</u>: The Park Villas Building consists of 18 Unsold Units and construction was about 72% completed as of the Petition Date. Unsold Units will be sold in bulk upon confirmation of the Plan and the successful bidder at the Sale shall be assigned the Sold Units that are the subject of unclosed Qualified Sales Contracts and shall assume the Debtors' obligations under the Qualified Sales Contracts, but will not assume statutory warranties or other obligations that would negate bulk assignee status under Florida's Distressed Condominium Relief Act.

5. <u>Plaza Building owned by Plaza</u>: The Plaza Building consists of 11 Unsold Units, including a retail unit, and construction was about 75% completed as of the Petition Date. All Unsold Units will sold "as is" pursuant to the Sale.

Based on an appraisal provided by the Debtors' appraiser during the initial stages of the Chapter 11 Cases, the Debtors believe that the value of the Artecity Project was $37.7 million on the Petition Date. CCV disputes the Debtors' value of the Artecity Project as of the Effective Date of the Plan.

## B.    **Management/Employees and Insiders of the Debtors**

### 1.    **Claudio Benedetti**

Claudio Benedetti is the managing member of Management, which manages all of the Debtors. Except for the reimbursement of expenses incurred in the ordinary course of the Debtors' businesses, Mr. Benedetti's salary and benefits are not paid directly by the Debtors. All compensation to Mr. Benedetti is paid through Sunny Houses Cons, LC, who the Debtors hired and continue to employ as a consultant for construction management services. When the Debtors resumed construction of the Artecity Project in October 2010, Mr. Benedetti began receiving monthly compensation in the amount of $18,000, consistent with the budget attached as Exhibit "A" to the Interim DIP Loan Order (the "<u>North/South Budget</u>") and additional terms included in the DIP Loan Order.

Mr. Benedetti was born in Italy and has been in the real estate business since 1988. He has been involved in the South Florida real estate market since 1999. Prior projects Mr. Benedetti has been involved in as a manager or developer, include, among others: (a) the Milfred building, a 16-unit building on Pennsylvania Avenue in Miami Beach; (b) the Ambassador Condominium, a 22-unit building on Meridian Avenue in Miami Beach; (c) the Art Deco 612 and 622 buildings, a total of 22 units located on 15th Street in Miami Beach; (d) the Sunrise Court building, a 20-unit building on Lenox Avenue in Miami Beach; and (e) the Cosmopolitan building, a 12-unit building on 15th Street in Miami Beach.

### 2.    **Alessandro Ferretti**

Mr. Ferretti resigned as the co-managing member of Management effective April 2010; however, he has maintained a role as consultant to the Debtors. Except for reimbursement of expenses incurred in the ordinary course of the Debtors' business before April 2010, Mr. Ferretti's salary and benefits were not paid directly by the Debtors. All compensation to Mr. Ferretti through April 2010 was paid through The Property Network, Inc., who Holding hired for

6

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

real estate consulting services. The Debtors currently employ Mr. Ferretti's company, European Advisors, Inc., for real estate consulting services. When the Debtors resumed construction of the Artecity Project in October 2010, Mr. Ferretti began receiving monthly compensation in the amount of $18,000, consistent with the North/South Budget and additional terms included in the DIP Loan Order.

Mr. Ferretti was born in Italy and earned a doctorate degree in civil engineering and architecture from the University of Bologna. He has been involved in the real estate business since the early 1980's and has been involved in the South Florida real estate market as a developer since the early 1990's. Mr. Ferretti's prior real estate developments include: (a) The Wave, a 66-room boutique hotel on Ocean Drive in Miami Beach; (b) the Ambassadors, 3 buildings with a total of 28 units on Michigan Avenue in Miami Beach; (c) the Atlantic Center, a 75,000 square-foot building in Miami Beach; and (d) the Traymore Hotel on Collins Avenue in Miami Beach.

### 3. Piero Salussolia

Piero Salussolia has an ownership interest in Museum Park, LLC, which owns the largest fractional ownership interests in Holding and Management. Mr. Salussolia is also an attorney holding licenses to practice law in Florida and California. He has been involved in the Artecity Project since its inception and played a material role in various pre-petition legal and non-legal matters. Except for reimbursement of expenses incurred in the ordinary course of the Debtors' business, Mr. Salussolia's salary and benefits were not paid directly by the Debtors. His compensation was paid through Piero Salussolia, P.A. The Debtors currently employ Mr. Salussolia's company for real estate consulting services. When the Debtors resumed construction of the Project in October 2010, Mr. Salussolia began receiving monthly compensation in the amount of $5,000, consistent with the North/South Budget and additional terms included in the DIP Loan Order.

### 4. Management, Employees and Insiders of the Debtors

During the two (2) years prior to the Petition Date and during the Chapter 11 Cases, Management has managed the Debtors' operations and has been the general partner of Holding. Mr. Ferretti was one of two managing members of Management until he resigned from this position, effective April 2010. Mr. Benedetti was the other managing member of Management and has been the sole managing member since April 2010.

Before and since the Petition Date, only Park employed four employees and one independent contractor. There are no outstanding wages owed to Park's employees.

Holding owns 100% of the membership interests in Park, Plaza, Governor, Artepark and Park Villas.

The holders of Equity Interests in Holding are as follows: (a) Acquire U.S.A., Inc. owns 11.76%; (b) Management owns 1%; (c) Claudio Benedetti owns 3.53%; (d) Gianni Monduzzi owns 8.24%; (e) Giorgio Bassi and Donatella Marzagalli own 8.82%; (e) Marooned, Inc. owns 23.53%; and (f) Museum Park, LLC owns 43.12%.

7

The holders of Equity Interests in Management are as follows: (a) Acquire U.S.A., Inc. owns 11.88%; (b) Claudio Benedetti owns 3.57%; (c) Gianni Monduzzi owns 8.32%; (d) Giorgio Bassi and Donatella Marzagalli own 8.9%; (e) Marooned, Inc. owns 23.77%; and (f) Museum Park, LLC owns 43.55% of Management.

## C.    Events Leading to Filing the Chapter 11 Cases

In September 2005, Holding closed a construction loan (the "Construction Loan") from Corus Bank, N.A. ("Corus") in the amount of $60.3 million.  Park, Plaza, Governor, Artepark and Park Villas guaranteed the Construction Loan (the "Debtor Guaranties") and Alessandro Ferretti and Piero Salussolia, solely in their individual capacities, guaranteed Holding's construction obligations under the Construction Loan documents (respectively, the "Ferretti Guaranty" and the "Salussolia Guaranty").

In September 2009, Corus was declared insolvent and its assets were seized by the Federal Deposit Insurance Commission ("FDIC").  Just before the FDIC takeover of Corus, the Debtors had submitted construction draw request 40 to Corus, which was never funded. After the FDIC takeover of Corus, the Debtors submitted construction draw requests 41-43, which were never funded by the FDIC or CCV, who the FDIC transferred the Construction Loan to in October 2009. Ultimately, holders of Equity Interests in the Debtors and third-party lenders loaned in excess of $2 million to the Debtors, which partially funded draw requests 40-43.  The Debtors ceased construction of the Artecity Project in October 2009 due to lack of funding and related causes.[2]

In October 2009, the FDIC transferred all of the Corus loans, totaling $4.5 billion in face amount and $2.772 billion in value, to CCV.  The FDIC owns 60% of CCV and CCV Managing Member, LLC, an affiliate of Starwood Capital Group and others, purchased a 40% interest in CCV for $554 million.

In March 2010, CCV commenced an action to foreclose its mortgages on the Artecity Project, to seek the appointment of a receiver, and to assert breach of contract claims against (i) the Debtors for alleged breaches of the Construction Loan documents, (ii) Alessandro Ferretti and Piero Salussolia for alleged breaches of the Ferretti and Salussolia Guaranties; and (iii) others, *CCV v. Artecity Holdings, Ltd., et al.*, Case No. 10-14899-CA-08 (the "Foreclosure Case"), pending in the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (the "Circuit Court").  During the Foreclosure Case, CCV made protective advances (the "Protective Advances") under the Construction Loan for services necessary to protect its interests in the Artecity Project, including for expenses such as insurance and for services such as power, water and security.

---

[2]    The forgoing summary is provided for informational purposes only and shall not constitute an admission, waiver or estoppel concerning the timing of the Debtors completing construction of the Artecity Project or closing Preconstruction Agreements.  The Debtors reserve and retain any rights and remedies held in that regard against parties to Preconstruction Agreements.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

In addition to loan proceeds, sources of income from the Artecity Project during 2009 and 2010 were rental proceeds received by Governor (approximately $15,000 per month since the fall season of 2009) and payments for various services to Governor from Artecity Governor Condominium Association, Inc. Governor's 2009 gross income was $94,013.24. Governor's 2010 gross income through the Petition Date was $115,645.

## D. Pre-Petition Indebtedness

### 1. Secured Debt

#### a. The Construction Loan

Payment of the Construction Loan is treated in the Plan as part of the Class 3 Secured Claim of CCV. Pursuant to the Settlement Agreement, more fully described below, the Debtors and CCV agree that the Allowed amount of CCV's Class 3 Claim shall be $51 million. CCV has a lien on virtually all of the property concerning the Artecity Project to secure repayment of the Construction Loan. On April 8, 2011, CCV timely filed its *Notice of Election Pursuant to 11 U.S.C. 1111(b) By Corus Construction Venture, LLC* [D.E. 468], pursuant to which, CCV provided notice that it chose to have its Claim treated in accordance with section 1111(b) of the Bankruptcy Code in all of the Debtors' cases.

#### b. 2010 *Ad Valorem* Property Taxes

*Ad valorem* real estate taxes for the year 2010 are unpaid and are treated in the Plan as a Class 2 Claim. Payment of the taxes is secured by first priority liens against the unsold Governor units, North and South Towers, and Plaza and Villas Buildings. The Miami-Dade Tax Collector filed a proof of Claim in the Chapter 11 Cases for the approximate amount of $378,088.71.

### 2. Deposit Claims

On the Petition Date, the Debtors were parties to at least 93 Preconstruction Agreements for the sale of condominium units. Pre-petition purchasers made deposits, currently held in escrow by Fidelity National Title Insurance Company ("Fidelity"), for a total amount equal to twenty percent (20%) of the purchase price of each unit that is the subject of a Preconstruction Agreement. Pursuant to the terms of the Preconstruction Agreements and Florida law, pre-petition, the Debtors used half of each deposit for construction and development of the Artecity Project, leaving an amount equal to ten percent (10%) of each purchase price plus interest remaining in escrow (the "Fidelity Escrow Reserve"). Consequently, the 10 remaining Deposit Claims are partially Secured and partially Unsecured Claims.

As set forth in the Claims Analysis annexed to this Disclosure Statement, many purchasers under the Preconstruction Agreements have filed proofs of Claim against the Debtors, pursuant to which, they asserted cumulative Claims totaling $6,680,691. The Debtors scheduled approximately $5,514,700 for Deposit Claims that are not the subject of proofs of Claim.

By Orders of the Bankruptcy Court, as of June 1, 2011, settlements have been approved

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

with at least 66 holders of Deposit Claims, and the Debtors renegotiated approximately 15 Preconstruction Agreements for purchase and sale of Sold Units. Pursuant to the settlements, holders of Deposit Claims waived their Claims and agreed that any proofs of Claim filed in the Chapter 11 Cases shall be deemed stricken. On January 20, 2011, the Bankruptcy Court entered an Order [D.E. 312] (the "Settlement Procedures Order") establishing expedited settlement procedures to resolve Deposit Claims, pursuant to which, the Debtors may seek the entry of an Order approving confidential settlements with holders of Deposit Claims after the expiration of a ten-day objection period if no timely objection is received.

The Debtors dispute any Claims that they are in breach of the Preconstruction Agreements and reserve the right and intend to object to Deposit Claims and/or initiate adversary proceedings concerning Deposit Claims that are classified under the Plan as Class 1, Class 4B and Class 5 Claims. As of June 1, 2011, the following pre-petition purchasers hold 10 Deposit Claims (the "Deposit Claimants") for pre-petition deposits they made totaling $1,053,000.00: (a) Bruce and Toni Waterman *et al.*; (b) Carlo Zufetti; (c) Daniel & Josue B. Carrillo; (d) End is a Real Estate, LLC; (e) Eraldo Sayles Holding/P. Sayles; (f) Francesco Toldo; (g) Kenneth Ellner; (h) Kristen Martino and Inga Wilson; (i) Michael Forte; and (j) Richard Vasquez.

### 3.     Unsecured Claims

In addition to the indebtedness described above, pursuant to proofs of Claim filed in the Debtors' cases, which the Debtors may object to until 120 days after the Effective Date of the Plan, and pursuant to undisputed amounts scheduled for creditors that have not filed proofs of Claim, the Debtors' unsecured indebtedness totals approximately $25,271,525, representing: (a) approximately $5,823,171 from proofs of Claim asserted by construction trade creditors; (b) approximately $330,923 in undisputed scheduled amounts for construction trade creditors who have not filed proofs of Claim; (c) approximately $4,693,815 from proofs of Claim asserted by non-insider pre-petition lenders; (d) approximately $13,459,375 from proofs of Claim asserted by claimants that appear to be direct or indirect holders of Equity Interests in the Debtors (some of whom may be Insiders and Affiliates); and (e) approximately $964,241 in undisputed scheduled amounts for parties that appear to be direct or indirect holders of Equity Interests in the Debtors. (Note that the Distribution Analysis annexed to this Disclosure Statement may differ from the forgoing amounts because the Debtors included what they believe should be the Allowed amount claimed or scheduled for each creditor in the Distribution Analysis, subject to any objections to proofs of Claim, which the Debtors reserve the right to file until 120 days after the Effective Date pursuant to the Plan.)

Pursuant to the Junior Lien Avoidance Order, all Allowed Claims held by pre-petition construction trade creditors shall be treated as Unsecured Class 5 Claims under the Plan.

Holders of Claims listed on the Claims Analysis annexed to this Disclosure Statement as "Insider and/or Affiliate Claims" appear to be affiliated with entities or persons who hold Equity Interests in Management and Holding. These Claims are classified as Class 5 General Unsecured Claims in the Plan. Prior to reaching a compromise with the Debtors (described below), CCV's position in this case was that the Construction Loan documents with the Debtors and other guarantors contain subordination agreements enforceable under applicable

nonbankruptcy law against some or all "Insider and/or Affiliate Claims" and, therefore, such Claims should be separately classified in the Plan in a Class subordinate to Class 5 General Unsecured Claims pursuant to section 510 of the Bankruptcy Code. In response to CCV's prior position, the Debtors reviewed the Construction Loan documents, and determined that although the Debtors and two individuals, Alessandro Ferretti and Piero Salussolia, signed subordination agreements, none of the claimants with direct and indirect Equity Interests signed such agreements. Therefore, it continues to be the Debtors' view that such claims are not subject to subordination and, consequently, the Debtors have not separately classified such Claims.

**SECTION III**
**THE CHAPTER 11 REORGANIZATION CASES**

**A.     The Single Asset Real Estate Motion**

CCV filed a motion [D.E. 21] requesting the Court to determine that the Debtors are subject to provisions of the Bankruptcy Code governing Single Asset Real Estate debtors on July 30, 2010. Pursuant to section 362(d)(3) of the Bankruptcy Code, if a debtor's property is deemed to be Single Asset Real Estate, relief from the automatic stay is available to a secured creditor unless, within ninety days after the date of the order for relief (in this case, the Petition Date), the debtor has filed a plan "with a reasonable possibility of being confirmed within a reasonable time" or has begun to make specified monthly payments to the secured creditor. 11 U.S.C. § 362(d)(3). By Order dated August 31, 2010 [D.E. 94], the Court determined that the Artecity Project qualifies as Single Asset Real Estate and the provisions of section 362(d)(3) apply to the Debtors' Chapter 11 Cases.

**B.     Debtors' Motion to Obtain Credit**

On July 28, 2010, the Debtors filed a motion [D.E. 12] (the "Financing Motion") requesting the Court to authorize the Debtors to obtain credit up to the amount of $2.725 million from certain holders of Equity Interests to finance the costs for completing construction of the Artecity Project. Pursuant to the Financing Motion, the Debtors requested the Court to grant the holders of certain Equity Interests a lien equal in priority to CCV's lien securing the Construction Loan. The Debtors also reserved the right to request use of Cash Collateral at a later time.

CCV filed an objection to the Financing Motion [D.E. 56]. After the parties engaged in extensive discovery, a hearing was held on August 30, 2010. During a recess at the hearing, the Debtors obtained a commitment from CCV to loan the Debtors up to $2.725 million (the "CCV DIP Loan") to complete construction.

On September 10, 2010, after further negotiations between the parties, the Court entered its Order (I) Authorizing Debtors to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (II) Granting Adequate Protection to Prepetition Secured Lender Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364 [D.E. 110] (the "Interim DIP Loan Order"). After the Miami-Dade Tax Collector filed a limited objection [D.E. 112] to the Interim DIP Loan Order, which was resolved by the parties, the Court entered its Amended Order (I) Authorizing

11

Debtors to Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, (II) Granting Adequate Protection to Prepetition Secured Lender Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, and (III) Scheduling Final Hearing on October 7, 2010 [D.E. 122] (the "Amended DIP Loan Order"). Pursuant to the Amended DIP Loan Order: (a) the Miami-Dade Tax Collector's tax liens are senior to CCV's liens on the Artecity Project; (b) the Interim DIP Loan Order is deemed effective as of September 15, 2010; and (c) the Court scheduled a final hearing on the Interim DIP Loan Order. At the October 7, 2010 final hearing on the DIP Loan Order, the parties agreed to submit a final order (the "Final DIP Loan Order"; collectively, the Interim DIP Loan Order, Amended DIP Loan Order and Final DIP Loan Order are referred to herein as the "DIP Loan Orders") attaching additional agreements entered into by the parties concerning the CCV DIP Loan. The Bankruptcy Court entered the Final DIP Loan Order [D.E. 366] on February 16, 2011.

**C.**     **Resolution of Pre-Petition Purchaser Deposit Claims Regarding Pre-Petition, Preconstruction Agreements for the Sale of Condominium Units in the North/South Towers and the Governor/Villas Buildings**

As of the Petition Date, the Debtors were parties to at least 93 pending Preconstruction Agreements for the sale of condominium units in the North and South Towers and Governor and Villas Buildings. During the Chapter 11 Cases, the Debtors reached agreements with most of the purchasers and, pursuant to the settlement terms, the affected Preconstruction Agreements shall be deemed rejected by the Debtors and settling purchasers waived any rights to assert any type of Claims in the Chapter 11 Cases (and if a proof of Claim was filed it shall be deemed stricken). By Orders of the Bankruptcy Court, settlements with 66 of the approximately 93 holders of Deposit Claims have been approved.

As of April 30, 2011, the Debtors' attorneys held Deposit Claim settlement payments totaling $743,000, of which $403,000.00 shall be paid to CCV pursuant to the Settlement Agreement. As of June 1, 2011, the Debtors received additional net recoveries from Deposit Claim settlements totaling $63,698.31. The Settlement Agreement provides that post- April 30, 2011 Deposit Claim settlements shall be used first to pay awarded but unpaid attorneys' fees and expenses directly related to such recoveries, and that CCV shall be paid 50% of the net remaining recoveries, and the Reorganized Debtors may retain 50% to fund post-Effective Date expenses of litigation described in Section E below.

**D.**     **Order Granting Limited Substantive Consolidation**

On May 4, 2011, the Court entered the Limited Consolidation Order, pursuant to which: (a) all assets and liabilities of the Debtors shall be treated as though they were pooled solely for purposes of voting on, Confirmation of and Distributions under the Plan, (b) all inter-company Claims are terminated; (c) a Claim against any one of the Debtors shall be treated as a single Claim against the consolidated estate of Holding; and (d) all Claims filed by the same creditor against more than one of the Debtors are eliminated to the extent that such Claims are duplicate Claims.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Since the substantive consolidation of the Estates was ordered by the Court solely for purposes of voting on, confirmation, and making Distributions under the Plan, the Limited Consolidation Order provides that substantive consolidation shall not: (a) affect the legal and organizational structure of each such Debtor from and after the Effective Date; (b) affect the status of title of Property held by the Debtors; (c) affect or change a Claim that any Debtor would possess had any of the Chapter 11 Cases not been substantively consolidated, or any defenses that any defendant in respect of such Claim would have in connection therewith; (e) destroy or otherwise affect the separate corporate existence of each Debtor; (e) divest any Debtor of any tax attributes; or (f) affect any fees paid by, or accrued in respect of, any Debtor to the U.S. Trustee or the Clerk of the Bankruptcy Court from the Petition Date.

## E.    Debtors' Pending Claims and Potential Recoveries for Unsecured Creditors

### 1.    Action Against Soares da Costa CS, LLC ("SDC") and Soares da Costa Constucao, SGPS, S.A. ("SDC Parent")

On August 15, 2005, certain Debtors entered into four (4) construction contracts with SDC, pursuant to which, SDC agreed to serve as the General Contractor to administer and supervise construction of the North Tower, the South Tower, the Governor Building and the Villas Building. SDC Parent entered into four (4) written guaranties on the same date to guarantee SDC's contractual obligations. The Debtors believe that SDC failed to perform many of its contractual obligations and, ultimately, abandoned the Artecity Project in early 2008. Consequently, on April 1, 2008, certain Debtors commenced Circuit Court Case Number 08-17586 CA 31.

The Debtors have asserted four (4) breach of contract claims against SDC and four (4) breach of guaranty claims against SDC Parent for cumulative damages in excess of $45 million. SDC and SDC Parent have denied all material allegations against them and contend that the Debtors' damages Claims are excessive and should be capped at $2 million due to liquidated damages provisions in various contracts between the parties, which the Debtors dispute. SDC and SDC Parent have also asserted counterclaims, including breach of contract claims, claims for unjust enrichment and *quantum meruit*, and Lien foreclosure claims.

This case was removed by the Debtors to the Bankruptcy Court on September 14, 2010, commencing adversary proceeding number 10-03595-AJC. The defendants filed their Motion for Mandatory or Permissive Abstention or, In the Alternative, For Remand [D.E. 7; Adv. Proc. No. 10-03595-AJC]. On October 25, 2010, the Bankruptcy Court entered its Order granting the defendants' request for mandatory abstention [D.E. 13; 10-03595-AJC]. Shortly after the Effective Date, the Debtors will continue with the prosecution of their Claims against SDC and SDC Parent in the Circuit Court.

The Debtors have agreed to retain the law firm of Levine Kellogg Lehman Schneider + Grossman LLP ("LKLSG"), the Debtors' current bankruptcy attorneys, under a contingency fee arrangement to prosecute their claims against SDC and SDC Parent after confirmation of the Plan. Pursuant to the terms of the contingency fee arrangement, LKLSG shall be entitled to full reimbursement of reasonable expenses and costs, and payment of attorneys' fees equal to (a) 1/3

the net recovery of any judgment, settlement or partial settlement obtained prior to or from any trial verdict issued without an appeal, exclusive of any award of attorney's fees, or (b) 1/3 of the net recovery plus an additional 5% if the case is appealed. In the event SDC or SDC Parent makes a settlement proposal which LKLSG or the Debtors believe is a reasonable settlement offer, the Debtors shall serve notice of the settlement proposal to affected creditors and file same with the Bankruptcy Court, which shall retain jurisdiction to authorize the Debtors to enter into any such settlement after notice and a hearing.

Pursuant to the Settlement Agreement, 25% of net recoveries above $3 million (after payment of attorneys' fees, any experts' fees and expenses/costs) shall be paid to CCV. All remaining amounts be retained by the Debtors and used to make Distributions for Allowed Class 5 Claims under the Plan.

### 2.    Action Against Silva Builders, Inc.

Circuit Court Case Number 09-45832 CA 30 involves claims by Park, Artepark and Park Villas against a former subcontractor, Silva Builders, Inc., to discharge construction Liens. This case was removed by the Debtors to the Bankruptcy Court on August 26, 2010, commencing adversary proceeding number 10-03540-AJC, which is still pending. Silva Builders, Inc. has asserted three proofs of Claim against the Debtors' for the cumulative amount of $845,632.99. The Bankruptcy Court has scheduled a continued pre-trial conference in this proceeding on June 20, 2011.

The Debtors have agreed to retain LKLSG, the Debtors' current bankruptcy attorneys, under a contingency fee arrangement to prosecute their claims against Silva Builders after confirmation of the Plan. Pursuant to the terms of the contingency fee arrangement, LKLSG shall be entitled to full reimbursement of reasonable expenses and costs, and payment of attorneys' fees equal to (a) 1/3 the net recovery of any judgment, settlement or partial settlement obtained prior to or from any trial verdict issued without an appeal, exclusive of any award of attorney's fees, or (b) 1/3 of the net recovery plus an additional 5 % if the case is appealed. In the event Silva Builders makes a settlement proposal which LKLSG or the Debtors believe is a reasonable settlement offer, the Debtors shall serve notice of the settlement proposal to affected creditors and file same with the Bankruptcy Court, which shall retain jurisdiction to authorize the Debtors to enter into any such settlement after notice and a hearing.

### 3.    Chubb Insurance Claim

The Debtors' pending Claim against Chubb Insurance, claim number 040509056556, has been asserted for the amount of $1.567 million for soft costs in connection with a loss resulting from rainfall at the Artecity Project on June 5, 2009. Chubb Insurance disputes the Debtors' Claim.

The Debtors have agreed to retain LKLSG, the Debtors' current bankruptcy attorneys, under a contingency fee arrangement to prosecute their claims against Chubb Insurance after confirmation of the Plan. Pursuant to the terms of the contingency fee arrangement, LKLSG shall be entitled to full reimbursement of reasonable expenses and costs, and payment of

attorneys' fees equal to (a) 1/3 the net recovery of any judgment, settlement or partial settlement obtained prior to or from any trial verdict issued without an appeal, exclusive of any award of attorney's fees, or (b) 1/3 of the net recovery plus an additional 5 % if the case is appealed. In the event Chubb Insurance makes a settlement proposal which LKLSG or the Debtors believe is a reasonable settlement offer, the Debtors shall serve notice of the settlement proposal to affected creditors and file same with the Bankruptcy Court, which shall retain jurisdiction to authorize the Debtors to enter into any such settlement after notice and a hearing.

Pursuant to the Settlement Agreement, CCV shall be entitled to receive 50% of net recoveries (after payment of attorneys' fees, any experts' fees and expenses/costs) that may be received by the Debtors from Chubb Insurance from this Claim. All remaining amounts be retained by the Debtors and used to make Distributions for Allowed Class 5 Claims under the Plan.

**F.     The CCV DIP Loan and CCV's Default Motion**

Pursuant to the DIP Loan Orders, Holding was authorized to: (i) obtain post-petition financing secured on a senior secured, priming basis from CCV, guaranteed by the other Debtors except for Management, up to the principal amount of $2.725 million; and (ii) use the CCV DIP Loan proceeds consistent with the Budgets attached to the Final DIP Loan Order, subject to permitted variances within the Budgets; and (iii)  use amounts agreed to in the Final DIP Loan Order for payment of construction and other expenses. Adequate protection accorded to CCV under the DIP Loan Orders consisted of the payment of sale proceeds from the sale of unsold condominium units, other than in the Governor building, up to an amount equal to the value of $223.26 per square foot of saleable square feets.

The DIP Loan was structured to be funded by CCV in two tranches, consistent with two phases of construction to complete the Artecity Project. The DIP Loan Orders provide that the first tranche shall be funded in an amount of up to $2.725 million to complete construction of the North and South Buildings and, upon repayment of $500,000 under the first tranche, the second tranche shall be funded by CCV in an amount of up to $2.5 million to complete construction of the Plaza and Villas Buildings, with the total outstanding balance never to exceed $2.725 million. The principal balance under the CCV DIP Loan as of June 1, 2011 is approximately 2.72 million. Interest accrues on the CCV DIP Loan at a rate of 6% per annum.

The DIP Loan Orders obligated the Debtors to meet certain performance benchmarks, including obtaining a Certificate of Occupancy for the North and South Buildings by April 11, 2011. On April 13, 2011, CCV filed its *Motion of Corus Construction Venture LLC For Order Determining Debtors' Default Under Final DIP Loan Order* [D.E. 478] (the " Default Motion"), pursuant to which, it alleged that the Debtors failed to meet certain performance benchmarks under the DIP Loan Orders. The Debtors filed a response to the Default Motion [D.E. 499] and argued that it should be denied because the Debtors' representatives fully performed their obligations under the DIP Loan Orders, and the technical defaults alleged by CCV in the Default Motion were due to unforeseen circumstances beyond the Debtors' control. After the Court held a hearing, the Debtors and CCV engaged in extensive settlement negotiations, resulting in the parties executing a settlement term sheet (the "Settlement Agreement") on June 1, 2011, a copy

of which is incorporated into and attached as Exhibit "A" to the Plan, subject to approval by the Bankruptcy Court. A hearing to consider approval of the Settlement Agreement has been scheduled on June 9, 2011 at 3:00 p.m

## G.    The Settlement Agreement

On June 1, 2011, the Debtors filed a pending motion (the "Settlement Motion") to request expedited approval of the Settlement Agreement and for the entry of an Order establishing Plan confirmation procedures and granting related relief.

Pursuant to the Settlement Agreement, the Debtors have agreed to modify their Second Amended Joint Plan of Liquidation. The Settlement Agreement provides that the Debtors are permitted to close the sales of the 35 Qualified Sales Contracts pursuant to the Sales Procedures Order and sell the Unsold Units in bulk, "as is", to the successful bidder at a public auction (the "Auction" or the "Sale") at confirmation, pursuant to and under the Plan, subject to liens for *ad valorem* real estate taxes. If the sales of the Qualified Sales Contracts are not closed two business days prior to the Sale, the subject Sold Units shall be the subject of the Sale and the Successful Bidder at the Sale shall assume all of the Debtors' obligations under the unclosed Qualified Sales Contracts, but will not assume statutory warranties or other obligations that would negate bulk assignee status under Florida's Distressed Condominium Relief Act.

CCV shall serve as the stalking horse bidder at the Sale for the amount of $50 million and shall have the right to credit bid up to $51 million plus any additional indebtedness on the CCV DIP Loan. Along with the Settlement Motion, on June 1, 2011, the Debtors filed their pending motion (the "Bidding Procedures Motion") for approval of the Bidding Procedures to be used in connection with the Sale. A hearing has been scheduled on the Bidding Procedures Motion on June 9, 2011 at 3:00 p.m.

CCV's obligations under the Settlement Agreement include funding:

(1)    the Debtors' monthly operating costs for April, May and June 2011 ($81,208.46 each month);

(2)    payment of $800 to the Debtors' appraiser, Blazejack & Company, from the DIP Loan Carve-Out, subject to the appraiser's fees being awarded by the Court;

(3)    payment of $7,900 to the Debtors' accountants, Sanson Kline Jacomino & Company, LLP, for Court-awarded fees;

(4)    payments to the Debtors' consultants through June 30, 2011 (defined in the DIP Loan Orders as "Permitted Affiliate Expenses") through the Effective Date of the Plan, provided the consultants cooperate in obtaining the consensual reorganization; and

(5)    reimbursement of hard costs paid to obtain a Certificate of Occupancy for the North and South Towers since the time the Debtors submitted their eighth draw request under the CCV DIP Loan.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

In addition, the Settlement Agreement provides that CCV shall: (i) release the Debtor Guaranties, the Ferretti Guaranty and the Salussolia Guaranty upon delivery by the Ferretti and Salussolia guarantors of completed financial statements using Corus forms; (ii) pay attorneys' fees or handle all matters related to the Debtors' termination of certain post-petition sales contracts; and (iii) vote in favor of the Plan, provided it is consistent with the terms of the Settlement Agreement.

In exchange for the consideration provided by CCV under the Settlement Agreement, CCV shall be entitled to receive:

(1)    $403,000.00 from recoveries received by the Debtors through April 30, 2011 in connection with resolving claims concerning the Preconstruction Agreements;

(2)    $57,204.00 in insurance premium refunds received by the Debtors from for overpayment of windstorm insurance premiums paid post-petition;

(3)    50% of net recoveries that may be received by the Debtors from their claim against Chubb Insurance for soft costs in connection with a loss resulting from rainfall on June 5, 2009 (after payment of attorneys' fees, any experts' fees and expenses/costs);

(4)    25% of net recoveries above $3 million that may be received by the Debtors from their Claims against SDC and  for its parent company, Soares da Costa Constucao, SGPS, S.A. (after payment of attorneys' fees, any experts' fees and expenses/costs);

(5)    50% of net recoveries received by the Debtors after April 30, 2011 concerning Preconstruction Agreements (after payment of Court-awarded attorneys' fees and expenses directly related to such recoveries);

(6)    the proceeds of the Sale if CCV is not the Successful Bidder; and

(7)    any and all undisbursed  rent collected through the date of the Sale in connection with the current leases for any units in the Governor Building.

As set forth in the Settlement Agreement, all net recoveries from the Chubb Insurance claims and SDC claims that are not to be transferred to CCV or distributed for payment of the Debtors' consultants and the Debtors' professionals for awarded fees and expenses shall be distributed *pro rata* to satisfy Allowed Class 5 Claims.

## H.    The 35 Qualified Sales Contracts

On January 12, 2011, the Bankruptcy Court entered the Sales Procedures Order: (a) authorizing the Debtors to sell condominium units free and clear of liens, claims, interests and encumbrances; (b) establishing sale procedures for the post-petition sale of condominium units without further hearing; and (c) approving the form of agreements and addendums to be used in connection with the sale procedures.  The Bankruptcy Court has also entered Orders authorizing

the Debtors to employ Majestic Properties as their sales broker ("Debtors' Broker") [D.E. 93] to advertise and negotiate the sale of units, and the law firm of Berman Rennert Vogel & Mandler, P.A. as their special counsel [D.E. 230] to act as the Debtors' closing agent and real estate counsel for filing sale and condominium documents with governmental agencies ("Debtors' Closing Agent").

In accordance with the Sale Procedures Order, the Debtors have marketed the sale of condominium units free and clear of all liens, claims, interests and encumbrances. Pursuant to the Settlement Agreement, the Debtors and CCV agree that the Debtors are authorized to close the sale of the 35 Qualified Sales Contracts up to two business days prior to the Sale. In the event any Qualified Sales Contracts fail to close by such time, the subject Sold Units will be transferred pursuant to the Sale and the successful bidder at the Sale shall be assigned the unclosed Qualified Sales Contracts and shall assume all of the Debtors' obligations under the affected Qualified Sales Contracts, including paying brokers' and co-brokers' commissions from the proceeds of each sale and using the purchasers' or Debtors' Closing Agent for a closing, as specified in the Qualified Sales Contracts, but shall not assume statutory warranties or other obligations that would negate bulk assignee status under Florida's Distressed Condominium Relief Act.

Pursuant to the Sales Procedures Order, the Debtors renegotiated 15 Preconstruction Agreements for the purchase and sale of 15 of the 35 Sold Units. In some cases, pre-petition deposits made by the relevant purchasers have not been transferred by Fidelity to the Debtors' attorneys, who are serving as escrow agent for deposits made to purchase the Sold Units. Pursuant to the Plan, the Confirmation Order shall direct Fidelity to disburse such deposits and all interest that has accrued on such deposits to the Debtors' attorneys trust account within ten Business Days after entry of the Confirmation Order. Upon performing its obligations under the Confirmation Order, Fidelity shall be deemed released from any liability with respect to the deposits from the Debtors, CCV and the buyers.

## I.    **Plan and Disclosure Statement**

By Order dated November 30, 2010 [D.E. 193], the Debtors had the exclusive right to solicit acceptances of the Plan or any amendment thereto until May 23, 2011 and they have filed a pending motion [D.E. 532], which was agreed to by CCV, to extend such deadline through August 22, 2011.

The Debtors filed their Joint Plan of Liquidation Dated October 25, 2010 [D.E. 150] and the Disclosure Statement in Support of Joint Plan of Liquidation Dated October 25, 2010 [D.E.149]. For a period after the Debtors filed their Joint Plan, they responded to objections by CCV, which led the Debtors to filing two amended versions of the Joint Plan and three amended versions of the Disclosure Statement, including their *Second Amended Disclosure Statement, as Modified, In Support of Debtors' Joint Plan of Liquidation* [D.E. 437], which was approved by the Court at the March 24, 2011 hearing on the Debtors' Disclosure Statement.

During the March 24, 2011 hearing, CCV articulated objections to confirmation of the Debtors' Second Amended Joint Plan of Liquidation. On April 8, 2011, two weeks after the

Court approved the Debtors' Disclosure Statement, CCV timely filed its *Notice of Election Pursuant to 11 U.S.C. 1111(b) By Corus Construction Venture, LLC* [D.E. 468], pursuant to which, CCV provided notice that it chose to make the election pursuant to section 1111(b) of the Bankruptcy Code in all of the Debtors' cases. Thereafter, the Court entered an agreed order [D.E. 544] setting the deadline for the Debtors' to file the Plan as June 1, 2011. By agreement of the Debtors' and CCV, the parties extended the June 1, 2011 deadline to June 2, 2011.

As set forth in detail above, the Settlement Agreement is the product of a compromise between CCV and the Debtors concerning CCV's objections to the Debtors' Second Amended Joint Plan of Liquidation.

**J.      Claims Bar Date and Claims Objections**

The Bankruptcy Court set November 30, 2010 as the deadline to file proofs of Claim in the Chapter 11 Cases, except for governmental units, for whom the deadline was set for January 24, 2011. The Plan provides that the Reorganized Debtors shall retain the right to object to proofs of Claim filed in the Chapter 11 Cases until 120 days after the Effective Date of the Plan. Therefore, even if your Claim is Allowed for voting purposes, you may not be entitled to a Distribution if an objection to your claim is later upheld.

**K.      Post-Petition Date Assets and Construction of the Artecity Project**

**1.      Debtors' Current Assets**

The Debtors' most significant asset is the Artecity Project; however, it is fully encumbered by debt that exceeds the value of the Artecity Project. In addition, the Debtors' assets also include: (a) the Retained Causes of Action; (b) rental proceeds accruing since March 2011 from the leasing of condominium units in the Governor Building; (c) Claims to 10 deposits and made by the Deposit Claimants under Preconstruction Agreements and accrued interests on such deposits, subject to the terms of the Settlement Agreement; (d) approximately $63,698.31 in net settlement proceeds concerning Deposit Claims received between May 1, 2011 and June 1, 2011, and any future recoveries concerning Deposit Claims, subject to the terms of the Settlement Agreement; and (e) insurance policies for general liability insurance and other insurance coverage necessary for construction.

**2.      Post-Petition Construction**

On the Petition Date the Debtors had not resumed construction of the Artecity Project and were relying on CCV to pay protective advances under the Construction Loan to continue services for power, water and security. After receiving funding under the CCV DIP Loan, the Debtors resumed construction of the North and South Towers in October 2010. After completing construction of the North and South Towers in December 2010, they applied for a Certificate of Occupancy with the City of Miami Beach and are currently working with the City to finalize supplemental work requested by the City. The Debtors did not resume construction of the Plaza and Park Villas Buildings during the Chapter 11 Cases.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

## SECTION IV
## THE JOINT PLAN OF LIQUIDATION; TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN; MEANS OF IMPLEMENTING THE PLAN

### A.    Purpose of the Plan

As required by the Bankruptcy Code, the Plan places Claims and Equity Interests in various Classes and describes the treatment each Class will receive.  The Plan also states whether each Class of Claims or Equity Interests is Impaired or unimpaired.  If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

### B.    Treatment of Claims and Equity Interests Under the Plan

The Plan divides Allowed Claims and Equity Interests in the Debtors into the following Classes:

| Class | Designation | Impairment | Entitled to Vote? |
|---|---|---|---|
| Class 1 | Election B Priority Deposit Claims | Unimpaired | No (not impaired) |
| Class 2 | Secured Claim of Miami-Dade Tax Collector for *Ad Valorem* Real Estate Taxes | Impaired | Yes |
| Class 3 | Secured Claim of CCV | Impaired | Yes |
| Class 4A | Election A Deposit Claims | Impaired | Yes |
| Class 4B | Election B Deposit Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | Equity Interests | Impaired | No (deemed to reject the Plan) |

### 1.    Unclassified Claims

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code.  They are not considered Impaired, and holders of such Claims do not vote on the Plan.  They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code.  As such, the Debtors have not placed the following Claims in any Class:

### a.    Administrative Expenses

Administrative Expenses are costs or expenses of administering the Chapter 11 Cases which are allowed under section 507(a)(2) of the Bankruptcy Code.  The Bankruptcy Code requires that all Administrative Expenses be paid on the Effective Date of the Plan, unless a particular Creditor agrees to a different treatment.

The following chart lists the Debtors' estimated Administrative Expenses and their proposed treatment under the Plan:

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Professional Fees and expenses of Levine Kellogg Lehman Schneider & Grossman LLP – Bankruptcy Attorneys for the Debtors | $340,000 | Paid in full on the Effective Date in accordance with the terms of the Settlement Agreement. |
| Professional Fees and expenses of Levine Kellogg Lehman Schneider & Grossman LLP directly related to recoveries from settlement of purchaser Deposit Claims | $50,000 | Paid from purchaser Deposit Claim recoveries received after April 30, 2011 on or after the Effective Date. |
| Professional Fees of Berman Rennert Vogel & Mandler, P.A. – Special Counsel for the Debtors | $0 | No fees will be paid by the Debtors on the Effective Date. The Professional is paid as an ordinary and necessary expense of condominium Sold Unit closings and from *ad valorem* real property tax refunds. |
| Professional Fees of R2 Construction Group – Construction Advisor for the Debtors | $0 | No fees will be paid by the Debtors on the Effective Date. |
| Professional Fees of Blazejack and Company -- Appraiser for the Debtors | $800 | Paid in full on or before the Effective Date by CCV in accordance with the terms of the Settlement Agreement. |
| Professional Fees of Sanson Kline Jacomino & Company – Accountants for the Debtors | $7,900 | Paid in full on or before the Effective Date by CCV in accordance with the terms of the Settlement Agreement. |
| Professional Fees of Majestic Properties – Real Estate Broker for the Debtors | $0 | No fees will be paid by the Debtors on the Effective Date. The Professional is paid as an ordinary and necessary expense of Sold Unit closings. |
| Office of the U.S. Trustee Fees | $0 | No fees will be paid by the Debtors on the Effective Date. All amounts due through the Effective Date shall be paid by the Debtors from funds received by CCV for the months of April-June 2011 pursuant to the Settlement Agreement. |
| CCV DIP Loan | $2.72 million | The Debtors' payment obligations under the DIP Loan Orders shall be deemed satisfied upon delivery of the proceeds of closings of the Qualified Sales Contracts, as provided under the Sales Procedures Order, and upon delivery of the proceeds of closing the bulk Sale pursuant to the Plan if CCV is not designated the successful bidder at the Sale. If CCV is designated the successful bidder pursuant to its credit bid, the Debtors' obligations under the DIP Loan Orders shall be deemed satisfied upon transferring all assets subject to the Sale to CCV and complying with any related Sale obligations. The Debtors' sale of Unsold Units pursuant to the Sale in connection with and pursuant to the Plan shall not be subject to documentary stamp taxes at closing pursuant to 11 U.S.C. § 1146. |

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

### b.  Priority Tax Claims

Priority Tax Claims are unsecured income, employment, and other taxes described by section 507(a)(8) of the Bankruptcy Code.  Unless the holder of such a priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding 5 years from the Petition Date.  The Debtors are not aware of any unpaid Priority Tax Claims.

### c.  U.S. Trustee Fees

The Disbursing Agent shall pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) on the Effective Date for any unsatisfied payments for pre-Confirmation Date periods and simultaneously provide to the United States Trustee an appropriate affidavit indicating the Cash disbursements for the relevant periods.  The Reorganized Debtors shall file with the Bankruptcy Court a consolidated post-confirmation quarterly operating report and pay the United States Trustee the appropriate sum required pursuant to 28 U.S.C. § 1930(a)(6) for post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), based upon all post-confirmation disbursements, until the earlier of the closing of the Chapter 11 Cases by the issuance of a Final Order by the Bankruptcy Court, or upon the entry of an Order by the Bankruptcy Court dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to another chapter under the Bankruptcy Code.

### d.  CCV DIP Loan

The Debtors' payment obligations under the DIP Loan Orders shall be deemed satisfied upon delivery of the proceeds of closings of the Qualified Sales Contracts, as provided under the Sales Procedures Order, and upon delivery of the proceeds of closing the bulk Sale pursuant to the Plan if CCV is not designated the successful bidder at the Sale.  If CCV is designated the successful bidder pursuant to its credit bid, the Debtors' obligations under the DIP Loan Orders shall be deemed satisfied upon transferring all assets subject to the Sale to CCV and complying with any related Sale obligations.  The Debtors' sale of Unsold Units pursuant to the Sale in connection with and pursuant to the Plan shall not be subject to documentary stamp taxes at closing pursuant to 11 U.S.C. § 1146.

### 2.  Classified Claims and Equity Interests

Following are the Classes set forth in the Plan and the proposed treatment they will receive under the Plan:

### a.  Class of Priority Unsecured Claims

Certain priority Claims that are referred to in sections 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in Classes.  The Bankruptcy Code requires that each holder of such a Claim receive Cash on the Effective Date of the Plan equal to the Allowed Amount of such Claim.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

### i.   Class 1 – Election B Priority Deposit Claims

Under the Plan, the holders of the remaining 10 Deposit Claims may choose Election A or Election B for treatment of their Claims, and their election will determine how their Deposit Claims are classified under the Plan. The Debtors believe that all Deposit Claimants will choose Election A, thereby having their Claims classified in the Plan under Class 4A and resulting in the waiver and release of Unsecured portions of Deposit Claims. The Debtors do not believe there will be any Allowed Election B Priority Deposit Claims since such claims are waived by choosing Election A. However, if any Deposit Claim holders choose Election B, they will retain the right to assert an Unsecured Election B Priority Deposit Claim for up to the amount of $2,600.00 pursuant to section 507(a)(7) of the Bankruptcy Code. The Debtors will file objections to all Election B Priority Deposit Claims and believe that such objections will be sustained, resulting in an Order disallowing those Claims. Nonetheless, on the Effective Date, the Disbursing Agent shall reserve, in the Disputed Claims Reserve, $2,600 for each holder of a Deposit Claim who chooses Election B in order to pay any amounts of Election B Priority Deposit Claims deemed Allowed pursuant to an Order of the Bankruptcy Court.

### b.   Classes of Secured Claims

Allowed Secured Claims are Claims secured by property of the Debtors' Estates (or that are subject to setoff) to the extent allowed as Secured Claims under section 506 of the Bankruptcy Code. All Secured Claims are fully secured because of property or pursuant to the election made by CCV under 11 U.S.C. § 1111(b). Following is the Debtors' proposed treatment of Classes 2 and 3, which contain Secured Claims against the Debtors:

### i.   Class 2 - Secured Claim of Miami-Dade County Tax Collector For *Ad Valorem* Real Estate Taxes

The Secured Claim of Miami-Dade County for *Ad Valorem* Real Estate Taxes includes certain prepetition claims for *ad valorem* real property taxes accrued during 2010 that are secured and constitute first priority liens against the Artecity Project pursuant to applicable nonbankruptcy law.

#### *Treatment With Respect To Sold Units*

2010 *ad valorem* real estate taxes for the Sold Units that are timely closed by the Debtors shall be paid in accordance with the Sales Procedures Order from associated sales proceeds at the statutory rate owed either to the Miami-Dade County Tax Collector, or to a tax certificate holder upon such closings. In the event any Sold Units fail to close at least 2 days prior to the date of the Sale, the Sold Units shall be the subject of the Sale subject to assumption of the Debtors' obligations under the contracts for the sales of the Sold Units. It is the Debtors' intent that as of March 31, 2011, the Miami-Dade Tax Collector shall be authorized to adjust its records to reflect that the Sold and Unsold Units are available for sale to tax certificate holders for 2010 tax year delinquencies.

The calculations of taxes owed shall be based on the assessments of the Miami-Dade

County Property Appraiser, and not on any interim reductions in said assessments that may have been made as a result of petitions filed by Debtor before the Value Adjustment Board challenging the Property Appraiser's assessments for any tax year during which Debtor, as of the January 1 taxing date, owned the subject Sold and Unsold Units. In the event that such interim reductions are made, and refunds are issued by the Tax Collector to Debtor, said refunds will not be processed by Debtors and will be returned to Tax Collector, through counsel for Tax Collector's Office, to be held in escrow pending the final disposition of the interim reductions, which may include challenges to such reductions by the Property Appraiser pursuant to state law. Alternatively, in the event of such interim reductions, the Debtors authorize the Tax Collector, if administratively feasible, to refrain from issuing refunds pending such final disposition of the interim reductions. Any interim reductions which are made by the Value Adjustment Board shall be deemed final if they are not challenged by the Property Appraiser, or the taxpayer, prior to the deadline for filing of such challenges pursuant to Florida law. If the final disposition of the interim reductions results in assessments less than the Property Appraiser's initial assessments, the Tax Collector shall issue refunds to Debtor as expeditiously as administratively feasible.

Post-petition taxes for the years 2011 forward shall be paid in the ordinary course pursuant to Florida law, and in a manner consistent with the provisions above with respect to payment based on the assessments of the Miami-Dade County Property Appraiser and with respect to refunds in the event that Value Adjustment Board petitions are filed. Notwithstanding any Plan provision to the contrary, the Miami-Dade Tax Collector shall not be required to petition for payment of a post-petition *ad valorem* tax as an Administrative Expense Claim.

The provisions of this section providing for the payment of taxes shall be deemed to comply with Section 197.192, Florida Statutes, with respect to any recordation of condominium documents contemplated by the Plan.

### Treatment With Respect To Unsold Units At The Sale

The portion of the Tax Collectors' Class 2 Claim secured by the Unsold Units for delinquent taxes shall become the obligation of the purchaser of the Unsold Units.

### ii.    Class 3 - Secured Claim of CCV

CCV shall be deemed to have made an election to have its entire Claim treated as secured under 11 U.S.C. § 1111(b)(2), which shall be deemed Allowed in the amount of $51 million. Subject to approval by the Court, and pursuant to the Bidding Procedures attached to the Plan, CCV shall serve as the stalking horse bidder at the Sale to sell the Unsold Units with an opening credit of $50 million. CCV shall also have the right to credit bid up to $51 million plus any outstanding indebtedness on the CCV DIP Loan at the Sale.

If CCV is not designated by the Court to be the successful bidder at the Sale, the Disbursing Agent shall transfer all proceeds of the Sale to CCV. Also, upon receipt of the total proceeds of Sale, two business days after another successful bidder is designated by Order of the Court, CCV shall deliver releases of liens concerning the Unsold Units that are the subject of the

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Sale to the Debtors' closing agent, and cancel any associated recorded notices of *lis pendens* with respect to each Unsold Unit.  If CCV is designated by the Court to be the successful bidder and ordered to close the Sale, CCV shall be deemed to receive the indubitable equivalent of its liens and security interests in the Unsold Units.

On the Effective Date of the Plan, the Disbursing Agent shall pay to CCV: (1) $403,000.00 from Deposit Claim settlement recoveries received by the Debtors through April 30, 2011 and one-half of the net recoveries (after payment of fees and expenses of such recoveries) received by the Debtors after April 30, 2011, which shall include recoveries from the Deposit Claimants under the terms of the Plan; (2) $57,204.00 in insurance premium refunds received by the Debtors from for overpayment of windstorm insurance premiums paid post-petition; and (3) any and all undisbursed rent collected through the date of the Sale in connection with the current leases for any units in the Governor building.  CCV shall retain its interests to potential litigation recoveries by the Debtors in accordance with the terms of the Settlement Agreement.

In accordance with the Settlement Agreement, on the Effective Date, upon delivery of completed financial statements using Corus forms by Alessandro Ferretti and Piero Salussolia, CCV shall be deemed to have released the Debtor Guaranties, the Ferretti Guaranty and the Salussolia Guaranty.

### c.      Classes of Deposit Claims

Class 4A and 4B Claims consist of the Secured portion of Deposit Claims.  Half of the principal amount of each Deposit Claim is a Secured Claim and remains in the Fidelity Escrow Reserve, plus accrued interest.

Each holder of a Deposit Claim may choose between: (i) Election A, as a full and final settlement and release of the Deposit Claim as of the Effective Date, whether such Claim is deemed secured, priority, or unsecured; or (ii) Election B.  If the holder of a Deposit Claim chooses Election A, he or she will have only one Claim under the Plan, which will be classified as a Class 4A Election A Secured Deposit Claim.  If the holder of a Deposit Claim chooses Election B, he or she will retain three classified Claims under the Plan, subject to such Claims being deemed Allowed over objections by the Reorganized Debtors, consisting of a Secured Claim in Class 4B, an Unsecured Class 1 Claim up to $2,600, and an Unsecured Class 5 Claim.

### i.      Class 4A – Election A Secured Deposit Claims

<u>Election A</u>:    As soon as reasonably practicable on or after the Effective Date, each holder of a Deposit Claim who chooses Election A shall receive a lump sum payment equal to half of ten percent (10%) of the purchase price set forth in the applicable Preconstruction Agreement and the Debtors shall receive the other half of ten percent (10%) of the purchase price plus accrued interest on the deposit from the Fidelity Escrow Reserve (the "<u>Election A Settlement</u>"). Election A Settlement payments shall be deemed to constitute full and final satisfaction and release of each Deposit Claim in the Debtors' Chapter 11 Cases, including Claims under sections 365(j) and 507(a)(7) of the Bankruptcy Code.  On the Effective Date, Fidelity shall disburse to the holders of Deposit Claims who choose Election A an amount equal

to half of the purchase price set forth in the applicable Preconstruction Agreement, and disburse to the Disbursing Agent the other half of ten percent of the purchase price plus accrued interest on the deposit, to be retained by the Reorganized Debtors subject to the terms of the Settlement Agreement.  Upon disbursing the deposits and accrued interest on the deposits under the Confirmation Order, Fidelity shall be deemed released from any liability with respect to the deposits from the Debtors, CCV and the Deposit Claimants.  The Confirmation Order shall provide that any litigation or other action or proceeding pending against the Debtors or the Artecity Project that has been commenced by the holder of a Deposit Claim who chooses Election A shall be deemed dismissed upon entry of the Confirmation Order.  The Confirmation Order shall also provide that, in the event Fidelity cannot locate a Deposit Claimant who chooses Election A within ten business days after entry of the Confirmation Order, Fidelity shall transfer all funds due and owing to such Deposit Claimant to the Disbursing Agent (and Fidelity shall be released from all liability with respect to the deposit upon doing so), who shall become responsible for locating and distributing all funds due and owing to such Deposit Claimant pursuant to the Plan.

**If the holder of a Deposit Claim fails to cast a ballot for or against the Plan or fails to reject Election A and fails to make a written choice to proceed with Election B, such holder shall be deemed to have chosen Election A.**

**The forgoing treatment of Class 4A Claims has been changed from prior proposed plans.**

### ii.    Class 4B – Election B Secured Deposit Claims

**Election B:**    A holder of a Deposit Claim who chooses in writing to reject Election A and to proceed with Election B shall not receive any Distribution on the Effective Date, but shall retain all rights to contest the Debtors' objection to any proofs of Claim and/or adversary proceedings filed with respect to such Deposit Claim.  The Reorganized Debtors intend to object to all three classified Claims of holders who choose Election B.

Ten percent (10%) of the purchase price set forth in the applicable Preconstruction Agreement entered into by holders of Deposit Claims who choose Election B is the amount equal to each Election B Secured Deposit Claim, plus accrued interest, because this amount is currently held in the Fidelity Escrow Reserve.  Funds securing Election B Secured Deposit Claims shall transferred by Fidelity to the Disbursing Agent within 10 business days after entry of the Confirmation Order (and Fidelity shall be released from all liability with respect to the deposit upon doing so), to be disbursed by the Disbursing Agent pursuant to the Plan upon entry of an Order on the disposition of an Election B Secured Deposit Claim.

### d.    Classes of Unsecured Claims

General Unsecured Claims are not secured by property of the Estates and are not entitled to priority under section 507(a) of the Bankruptcy Code.  Following is the Debtors' proposed treatment of Classes 5 Allowed General Unsecured Claims:

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

### i.   Class 5 - Allowed General Unsecured Claims

Class 5 consists of Allowed General Unsecured Claims, which includes Allowed Mechanic's Lien Claims, Claims of trade and business creditors for goods and services provided to the Debtors prior to the Petition Date, Claims for loans made to the Debtors pre-petition, and damage Claims arising from the rejection of executory contracts and unexpired leases, Claims asserted in litigation with respect to events occurring prior to the Petition Date, and Unsecured Deposit Claims pursuant to a Final Order allowing a Deposit Claim by a Deposit Claimant who choose Election B under the Plan. Holders of Allowed General Unsecured Claims shall receive *pro rata* Distributions from the Reorganized Debtors' interest in net litigation recoveries from the Debtors' Chubb Insurance, Silva Builders, and SDC Claims, which recoveries shall be distributed by the Disbursing Agent to Holders of Allowed Class 5 Claims from time to time in the Disbursing Agent's discretion.  The payment of Distributions under the Plan, if any, to holders of General Unsecured Claims from Chubb Insurance, Silva Builders and SDC litigation recoveries shall be deemed full and final satisfaction of all such Class 5 Claims.

### e.   Class of Equity Interests

Equity Interest holders are parties who hold an ownership interest in the Debtors. Following is the Debtors' proposed treatment of Equity Interests:

### i.   Class 6 – Equity Interests

Equity Interests shall continue to exist under the Plan, but holders of Equity Interests shall not have any rights to authorize or direct the Debtors in any manner and all property, voting, and any associated decision-making rights shall be extinguished upon the Effective Date. After consideration of various options and the expenses associated with such options, including the appointment of a liquidating trustee, the Debtors believe the continuation of Equity Interests as proposed is the most cost-effective way to liquidate the Debtors' assets under the Plan.

## C.   Means of Implementing the Plan

### 1.   Bulk Sale of Unsold Units

The primary means for implementing the Plan is the Sale pursuant to the Bidding Procedures attached to the Plan as Exhibit "B". The "as is" Sale of the Unsold Units will be free and clear of all liens and claims, with the exception of liens for *ad valorem* real estate taxes, which shall become the obligation of the purchaser. Qualified Sales Contracts that are not closed 2 business days prior to the Sale shall be the subject of the bulk Sale and the successful bidder shall be assigned and shall assume all of the Debtors' obligations under the unclosed Qualified Sales Contracts, including payment of brokers' commissions to the Debtors' Broker and co-brokers and using the Debtors' Closing Agent or buyers' closing agents as specified in the Qualified Sales Contracts, except the Qualified Bidder will not assume statutory warranties or other obligations that would negate bulk assignee status under Florida's Distressed Condominium Relief Act. The successful bidder designated by the Court shall have the right to take title to the subject Units as a bulk assignee under the Florida Distressed Condominium

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Relief Act. The Sale is expected to be scheduled by the Court immediately after the Confirmation Hearing on June 29, 2011 at 3:00 p.m. Subject to approval by the Court, the Bidding Procedures attached as Exhibit "B" to the Plan, which shall govern the Sale, provide that CCV shall serve as the stalking horse bidder at the Sale with an opening credit bid of $50 million. CCV shall have the right to credit bid up to $51 million plus any plus any outstanding indebtedness on the CCV DIP Loan.

If CCV is designated the successful bidder at the Sale, upon closing, the Debtors shall transfer all of their rights, title and interest in the applicable Unsold Units to CCV and the Debtors' payment obligations with respect to the Unsold Units shall be deemed satisfied. If CCV is not designated the successful bidder at the Sale, upon closing the Sale, proceeds of the Sale shall be transferred to CCV by the Disbursing Agent.

Upon closing the Sale, if CCV is not designated by the Court to be the successful bidder, two business days after another successful bidder is designated by Order of the Court, upon receipt of the total proceeds of Sale, CCV shall deliver releases of liens concerning the Unsold Units to the Debtors' closing agent, and cancel any associated recorded notices of *lis pendens* with respect to each Unsold Unit.

### 3.    Means for Financing Plan Distributions

Promptly after the Effective Date, the Reorganized Debtors shall focus their efforts on prosecuting the Retained Causes of Action; specifically, their Claims against SDC and its parent company, Silva Builders, Chubb Insurance and the Deposit Claimants.

25% of the net recoveries received on the Reorganized Debtors' Claims against SDC and its parent above $3 million, after payment of attorneys' fees, expert fees' and costs/expenses, shall be distributed to CCV and any remaining amounts shall be received by the Reorganized Debtors to distribute to holders of Allowed Class 5 Claims. Half of the net recoveries on the Reorganized Debtors' Claims against Chubb Insurance, after payment of attorneys' fees, expert fees' and costs/expenses, shall be distributed by CCV and any remaining amount shall be received by the Reorganized Debtors to distribute to holders of Allowed Class 5 Claims. All net recoveries on the Debtors' Claims against Silva Builders, after payment of attorneys' fees, expert fees' and costs/expenses, shall be received by the Reorganized Debtors to distribute to holders of Allowed Class 5 Claims.

The Debtors have agreed to retain their current bankruptcy attorneys, under a contingency fee arrangement to prosecute their Claims against SDC, Silva Builders and Chubb Insurance after confirmation of the Plan. Pursuant to the terms of the contingency fee arrangements, LKLSG shall be entitled to full reimbursement of reasonable expenses and costs, and payment of attorneys' fees equal to (a) 1/3 the net recovery of any judgment, settlement or partial settlement obtained prior to or from any trial verdict issued without an appeal, exclusive of any award of attorney's fees, or (b) 1/3 of the net recovery plus an additional 5% if the cases are appealed. In the event SDC, Silva Builders or Chubb Insurance makes a settlement proposal which LKLSG or the Debtors believe is a reasonable settlement offer, the Reorganized Debtors shall serve notice of the settlement proposal to affected creditors and file same with the

Bankruptcy Court, which shall retain jurisdiction to authorize the Debtors to enter into any such settlement after notice and a hearing. To the extent possible, expenses of prosecution of the Retained Causes of Action against Soares da Costa CS, LLC, Soares da Costa Constucao, SGPS, S.A., Silva Builders and Chubb Insurance shall be paid from the Debtors' fractional interest in Deposit Claim settlement proceeds received after April 30, 2011.

4.      **Post-Confirmation Management, Corporate Action and Governance of the Reorganized Debtors**

Except as provided in the Plan, the Reorganized Debtors will perform any obligation of the Debtors that remain and shall have full control and authority over Property of the Estates (as the term is defined in section 541 of the Bankruptcy Code) without the need for Bankruptcy Court approval pursuant to section 363 or 330 of the Bankruptcy Code, or any other provision of Bankruptcy Court or United States Trustee control or oversight during a chapter 11 case, including but not limited to: policy making, day-to-day operations, financing, transactions, corporate governance, and any and all other management activity. Upon the entry of the Confirmation Order, the transactions contemplated by the Plan, including without limitation the Sale, shall be deemed authorized and approved in all respects. On the Effective Date, the Reorganized Debtors shall be authorized to take all necessary and appropriate actions to effectuate the transactions contemplated by the Plan. The Reorganized Debtors shall have full control and authority over Property of the Estates (as the term is defined in section 541 of the Bankruptcy Code) without the need for Bankruptcy Court approval pursuant to section 363 or 330 of the Bankruptcy Code, or any other provision of court or United States Trustee control or oversight during a chapter 11 case, including but not limited to: policy making, day-to-day operations, financing, transactions, corporate governance, and any and all other management activity.

5.      **Limited Substantive Consolidation and Continued Corporate Existence**

As provided above in the Limited Consolidation Order, the limited substantive consolidation of the Debtors shall not (a) affect the legal and organizational structure of each such Debtor from and after the Effective Date; (b) affect the status of title of Property held by the Debtors; (c) affect or change a Claim that any Debtor would possess had any of the Chapter 11 Cases not been substantively consolidated, or any defenses that any defendant in respect of such Claim would have in connection therewith; (e) destroy or otherwise affect the separate corporate existence of each Debtor; (e) divest any Debtor of any tax attributes; or (f) affect any fees paid by, or accrued in respect of, any Debtor to the U.S. Trustee or the Clerk of the Bankruptcy Court from the Petition Date. Except as otherwise provided in the Plan, the Reorganized Debtors shall continue to separately exist after the Effective Date, with all of the powers provided under applicable law in the jurisdiction in which the Debtors are organized pursuant to their organizational documents in effect before the Effective Date, as such documents are amended by or pursuant to the Plan or pursuant to any amended articles or organization, amended or additional partnership agreements or amended bylaws. Notwithstanding the forgoing, the Debtors may change their status of incorporation or formation or alter its corporate structure (either through mergers, consolidations, restructurings, conversions, dispositions, liquidations, dissolutions, or otherwise) after the Effective Date as may be determined by the Debtors to be

appropriate. In each case in which the surviving, resulting, or acquiring Person in any such transaction is a successor to a Debtor, such successor Person shall perform the obligations of the applicable Debtor(s) under the Plan to pay or otherwise satisfy the Allowed Claims against the Debtor(s).

6.    **Vesting and Preservation of Assets**

On the Effective Date and pursuant to the Confirmation Order, the Reorganized Debtors shall retain ownership of the Confirmation Date assets for the benefit of the Estates and their creditors, all Avoidance Actions, including Retained Causes of Action, and any other causes of action or Claims for relief existing under state or federal law. The Reorganized Debtors shall have the full power, authority and standing to prosecute, compromise or otherwise resolve such actions, with all proceeds derived therefrom to become property of the Estates and distributed in accordance with the Plan and the Settlement.

7.    **Engagement and Compensation of Post-Confirmation Professionals**

The Reorganized Debtors may engage counsel, accountants, brokers and other professionals, including counsel, accountants, and other Professionals engaged by the Debtors during the Chapter 11 Cases, to represent them in connection with their duties under the Plan (the "Post-Confirmation Professionals"); provided, however, that Post-Confirmation Professionals shall not be precluded from representing the Reorganized Debtors to the extent that certain of their Administrative Expense Claims remain unpaid from the Estates. Any fees and expenses of such Post-Confirmation Professionals shall constitute Post-Confirmation Administrative Expense Claims. The Reorganized Debtors reserve the right to retain or terminate Professionals retained during the Chapter 11 Cases and, if terminated, such termination shall be effective on the Effective Date of the Plan.

Post-Confirmation Professionals retained by the Reorganized Debtors shall be authorized to file interim fee applications every sixty (60) days. Upon the expiration of ten (10) days after Post-Confirmation Professionals file and serve interim fee applications as provided below, or as soon as practicable thereafter, the Bankruptcy Court shall hold an expedited hearing to consider approval of Professionals' interim fee applications and authorization of payment to Post-Confirmation Professionals. Post-Confirmation Professionals shall serve interim fee applications to registered users of CM/ECF only and a summary page by U.S. Mail to all parties in interest who are not registered users of CM/ECF. Post-Confirmation Professionals shall provide copies of interim fee applications in their entirety upon request. Upon approval by the Bankruptcy Court of interim fee applications, the Reorganized Debtors shall be authorized to promptly pay all costs and fees approved by the Bankruptcy Court. The Bankruptcy Court shall retain jurisdiction to allow or disallow all Post-Confirmation Administrative Expense Claims of the Post-Confirmation Professionals. Payment of Post-Confirmation Professionals' awards of fees and expenses shall be governed by the Settlement Agreement.

b.    **Section 1146(a) Exemption for Unsold Unit Sales**

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers from the Debtors or the Estates to any other Person or entity pursuant to the Plan or in contemplation of the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment.

**D.**    **Provisions Governing Distributions**

    **1.**    **Distributions to Holders of Allowed Claims**

Except as otherwise provided in the Plan or ordered by the Bankruptcy Court, Distributions shall be disbursed by the Disbursing Agent. The Disbursing Agent shall make all Plan Distributions at its discretion in accordance with the Provision of the Plan and the Confirmation Order.

    **2.**    **Delivery of Distributions**

Subject to Bankruptcy Rule 9010, all Distributions to holders of Allowed Claims shall be made at the address indicated on proofs of Claims filed with the Bankruptcy Court by such holder or in the event a holder of an Allowed Claim did not file a proof of Claim at the address set forth on the Schedules, unless the Debtors were notified in writing of a change of address. In the event that a Distribution to a holder is returned as undeliverable, including any Deposit Claimants, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such Distribution shall be made to such holder; provided that such Distributions shall be deemed unclaimed property at the expiration of six (6) months from the date or disbursement of the second tranche of the Initial Distribution or any Distribution Date thereafter. After such date, all unclaimed property or interest in property may be redistributed to other creditors or administrative claimants, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

    **3.**    **Manner of Payment Under the Plan**

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

    **4.**    **Setoffs**

The Reorganized Debtors may, in their discretion, effect a setoff against any Claim and the Distributions to be made pursuant to the Plan in respect of such Claim with Claims of any nature whatsoever that the Reorganized Debtors may have against such Creditor; but neither the decision not to effect a setoff nor the allowance of any Claim shall constitute a waiver or release by the Reorganized Debtors of any claims against such Creditor.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

### 5.    Allocation of Plan Distribution Between Principal and Interest

To the extent any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and unpaid interest accruing since the Effective Date thereon, any Distribution with respect to such Allowed Claim shall, for federal and state income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

### 6.    Withholding and Reporting Requirements

In connection with the Plan and all Distributions hereunder, the Disbursing Agents shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority and all Distributions under the Plan shall be subject to any such withholding and reporting requirements.  The Disbursing Agent shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding or reporting requirements.  Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligation imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations.  Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as undeliverable Distributions.

## E.    Plan Procedures for Resolving and Treating Disputed Claims

### 1.    Objection to Claim Process and Deadline to File Objections to Proofs of Claim

Except as to applications for allowances of compensation and reimbursement of expenses under sections 330 and 503 of the Bankruptcy Code, the Reorganized Debtors shall have the sole right to make and file objections to Claims and Equity Interests subsequent to the Effective Date. The Reorganized Debtors shall have the sole authority to compromise, settle, or otherwise resolve or withdraw any objections, with approval of the Bankruptcy Court, which approval may be sought on negative notice pursuant to Local Rule 3007-1(C) and (D). Unless otherwise ordered by the Bankruptcy Court, the Reorganized Debtors shall file all objections to Administrative Expense Claims that are the subject of proofs of Claim or requests for payment filed with the Bankruptcy Court (other than applications for allowances of compensation and reimbursement of Professional Fee Claims), Claims and Equity Interests and serve such objections upon the holder of the Administrative Expense Claim, Claim, or Equity Interest as to which the objection is made as soon as is practicable, but in no event later than (a) one hundred twenty (120) days after the later to occur of the Effective Date or the date on which a proof of

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

Claim or request for payment is permitted to be filed with the Bankruptcy Court or (b) such later date as may be approved by the Bankruptcy Court.

### 2.    No Distributions Pending Allowance

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. For purposes of reserving distributions pending resolution of Disputed Claims, such Claims may be estimated upon motion and hearing. The Debtors will deposit amounts properly allocable on account of the Disputed Claim into the Disputed Claim Reserve until each Disputed Claim is either Allowed or an Order is entered disallowing the Claim.

### 3.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, a Distribution shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the Order of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Debtor shall provide to the holder of such Claim the Distribution to which such holder is entitled under the Plan.

### 4.    Voting Rights of Holders of Disputed Claims

Pursuant to Bankruptcy Rule 3018(a), a Disputed Claim will not be counted for purposes of voting on the Plan to the extent it is disputed, unless an Order of the Bankruptcy Court is entered after notice and a hearing temporarily allowing the Disputed Claim for voting purposes under Bankruptcy Rule 3018(a). Such disallowance for voting purposes is without prejudice to the claimant's right to seek to have its Disputed Claim allowed for purposes of distribution under the Plan.

### F.    Plan Provisions for Treatment of Executory Contracts and Unexpired Leases

### 1.    Treatment of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Bidding Procedures, the Plan, the Settlement, in the Confirmation Order or in any contract, instrument, release, indenture, or other agreement, or document entered into in connection with this Plan, as of the Effective Date the Debtors shall be deemed to have rejected each pre-petition executory contract and unexpired lease to which it is a party, including Preconstruction Agreements, unless such contract or lease (a) was previously assumed or rejected by the Debtors or is sold at the bulk Sale to the Successful Bidder, in which case such lease or executory contract shall be deemed assumed and assigned to the Successful Bidder, (b) previously expired or terminated pursuant to its own terms, (c) is the subject of a motion to assume filed on or before the Confirmation Date, or (d) is set forth in any Plan supplement, as an executory contract or unexpired lease to be assumed. The Confirmation Order shall constitute an Order of the Bankruptcy Court under sections 365 and 1123(b) of the

33

Bankruptcy Code approving the contract and lease assumptions or rejections described above, as of the Effective Date.

Each executory contract and unexpired lease that is assumed and relates to the use, ability to acquire, or occupancy of real property shall include (a) all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease and (b) all executory contracts or unexpired leases appurtenant to the premises, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, powers, uses, reciprocal easement agreements, vaults, and any other interests in real estate or rights *in rem* related to such premises, unless any of the foregoing agreements has been rejected pursuant to an Order of the Bankruptcy Court.

### 2.    Cure Payments

Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors. If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, cure shall occur following the entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment, as the case may be.

### 3.    Rejection Damages Claims

Proofs of all Claims arising out of the rejection of executory contracts and unexpired leases pursuant to this Plan shall be filed with the Bankruptcy Court, with proper supporting documentation detailing the calculation of such Claim, and served upon the Debtors and their counsel not later than thirty (30) days after the earlier of (a) the Effective Date, or (b) the date of entry of an Order of the Bankruptcy Court approving such rejection. Any Claims not filed within such time shall be forever barred from assertion against the Debtors, their Estates, the Reorganized Debtors, and their respective properties and interests. Unless otherwise ordered by the Bankruptcy Court, all Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as Class 5 General Unsecured Claims.

## G.    Retained Causes of Action

The Plan provides that the Reorganized Debtors shall have the authority to prosecute, defend, compromise, settle, or otherwise deal with any Retained Causes of Action as representative(s) of the Estates. The Reorganized Debtors shall pay the fees and costs associated with litigating the Retained Causes of Action in the ordinary course of business. The Reorganized Debtors shall have the sole discretion to determine, in their business judgment, which Retained Causes of Action to pursue, which to settle, and the terms and conditions of those settlements. In addition to retained claims and actions described in Article "E" of the Plan,

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

a list and description of the Retained Causes of Action is attached as Exhibit 2 to this Disclosure Statement. The Debtors reserve the right to supplement their list of Retained Causes of Action.

Upon conducting a preliminary investigation of their books and records concerning pre-Petition Date transactions, the Debtors do not believe that efforts to avoid such transactions, either as preferences, fraudulent transfers, or other avoidable transfers would result in a meaningful recovery for creditors, with the exception of the Debtors' Claims against SDC and its parent company, Silva Builders, and Chubb Insurance. Pre-petition construction of the Artecity Project ceased during October 2009; therefore, payments made between November 2009 and the Petition Date were primarily to Professionals which the Debtors later became authorized to retain by Order of the Bankruptcy Court and to sustain the Project. Moreover, the Debtors believe that payments made within ninety (90) days of the Petition Date were made in the ordinary course of their business. Nonetheless, pursuant to Article IX of the Plan, the Debtors have reserved their rights to pursue Avoidance Actions after confirmation of the Plan.

**H.      Retention of Jurisdiction After the Effective Date**

Subject to the terms of the Confirmation Order, the Bankruptcy Court shall retain jurisdiction over all matters set forth in Article XIV of the Plan.

**I.      Conditions Precedent to Confirmation of the Plan**

The following are conditions precedent to confirmation of the Plan, each of which must be satisfied:

1.      An Order granting the Settlement Motion shall have been entered by the Clerk of the Bankruptcy Court.

2.      An Order granting the Bidding Procedures Motion shall have been entered by the Clerk of the Bankruptcy Court.

**J.      Conditions Precedent to the Effective Date of the Plan**

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied:

1.      The Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court.

2.      All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

3.      There shall be no stay of the Confirmation Order in effect.

4.      The Sale contemplated herein shall have occurred and shall have been approved by the Court.

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

5.      All other actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

## K.    Exculpation

### 1.    Exculpation Under The Plan

*Subject to the occurrence of the Effective Date, neither the Debtors, CCV, the Disbursing Agent, nor any of their respective members, officers, directors, agents, accountants, financial advisors, attorneys, employees, brokers, partners, managers, Claudio Benedetti, Alessandro Ferretti, Piero Salussolia (including the attorneys for Benedetti, Ferretti and/or Salussolia), and representatives (the "Exculpated Parties") shall have or incur any liability to any Holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan; provided, however, that the foregoing shall not (a) operate as a waiver or release for (i) any express contractual obligation owing by any such Person, (ii) acts or omissions which constitute bad faith, willful misconduct, self dealing, breach of fiduciary duty or gross negligence, and (iii) with respect to Professionals, liability arising from claims of professional negligence which shall be governed by the standard of care otherwise applicable to professional negligence claims under applicable non-bankruptcy law, and, in all respects, the Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided further that nothing in the Plan shall, or shall be deemed to constitute a release of any Claims the Estates may have against the Exculpated Parties, arising out of conduct during the Case or with respect to, their respective obligations or covenants arising pursuant to the Plan; provided further that the foregoing shall not operate as a waiver or release of Claims by governmental entities arising under environmental or securities laws.*

### 2.    Injunction Relating to Exculpation

*The Confirmation Order will contain an injunction, effective on the Effective Date, permanently enjoining the commencement or prosecution by the Debtor and any other Person, whether derivatively or otherwise, of any Litigation Claim or causes of action exculpated (including by setoff or recoupment), released or discharged pursuant to the Plan against the Exculpated Parties.*

### 3.    No Recourse

*Notwithstanding that the Allowed Amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules*

36

*or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Disbursing Agent, its employees, or any of its respective Professionals, consultants, or their respective successors or assigns, or any of their respective property.*

## L.    Miscellaneous Plan Provisions

### 1.    Severability of the Plan

If any provision in the Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

### 2.    Binding Effect of the Plan

The rights and obligations of any entity named or referred to in the Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity.

### 3.    Controlling Effect of the Plan

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Florida govern this Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise provided in the Plan. To the extent of any inconsistency between the Plan and the Settlement, the Settlement shall control.

### 4.    Plan Modifications

The Debtors may alter, amend, or modify the Plan under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date, the Reorganized Debtors may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, and to accomplish such matters as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially adversely affect the treatment of holders of Claims under the Plan; provided, however, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or Order of the Bankruptcy Court. Modifications to the Plan after the Effective Date are limited to those circumstances specified in section 1127(e) of the Bankruptcy Code.

### 5.    Notices

Any notice, request, or demand required or permitted to be made or provided to, or upon, the Debtors hereunder shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, or (e) facsimile transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed,

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

addressed as follows:

> Thomas R. Lehman, P.A.
> LEVINE KELLOGG LEHMAN SCHNEIDER
> + GROSSMAN LLP
> 201 South Biscayne Blvd., 34th Floor
> Miami, FL 33131
> Telephone: 305.403.8788
> Facsimile: 305.403.8789
> E-Mail: TRL@LKLLAW.COM
>
> and
>
> Artecity Management LLC
> c/o Claudio Benedetti
> 435 21ST Street, Office 2
> Miami Beach, FL  33139

**6.      Successors and Assigns**

The rights, benefits and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of the heirs, executors, administrators, successors and/or assigns of such Person.

**7.      Professional Fee Claims**

All final requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code for services rendered to the Debtors or the Estates prior to the Effective Date must be filed and served on the Debtors, the U.S. Trustee, CCV as provided by Order of the Court governing Plan solicitation procedures.    Professionals requesting payment of Professional Fees or reimbursement of expenses under this provision shall file with the Bankruptcy Court an estimation of the maximum amount of compensation and/or reimbursement of expenses to be requested for the period from the last date of their final request for compensation or reimbursement through to the Effective Date.

**SECTIION V**
**VOTING REQUIREMENTS, ACCEPTANCE AND CONFIRMATION OF THE PLAN**

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan.    These include that (a) the Plan has classified Claims and Equity Interests in a permissible manner, (b) the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; (c) the Debtors have proposed the Plan in good faith; and (d) the Debtors' disclosures as required by Chapter 11 of the Bankruptcy Code have been adequate and include information concerning all payments made or promised by the Debtors in connection with the Plan. The Debtors believes that all of these conditions will have been met by the date set for the Confirmation Hearing.

38
**LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP**
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

The Bankruptcy Code also requires that the Plan be accepted by the requisite votes of Creditors (except to the extent that "cram-down" is available under Section 1129(b) of the Bankruptcy Code), that the Plan be feasible (that is, the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further reorganization of the Debtors, and that the Plan is in the "best interests" of all Creditors and Equity Interest holders (that is, that Creditors and Equity Interest holders will receive at least as much under the Plan as they would receive in a liquidation under Chapter 7 of the Bankruptcy Code).

To confirm the Plan, the Bankruptcy Court must find that all of these conditions are met. Even if the Creditors accept the Plan by the requisite votes, the Bankruptcy Court must make independent findings respecting feasibility of the Plan and whether the Plan is in the best interests of Creditors. These statutory conditions to confirmation are discussed below.

## A.    Classification of Claims and Equity Interests

The Bankruptcy Code requires that a plan of reorganization place each Creditor's Claim and each Equity Interest in a class with other Claims and Equity Interests that are "substantially similar." For the rationale for the classification of Claims and Equity Interests used in the Plan, see Section III of this Disclosure Statement. The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code.

## B.    Voting

### 1.    Impaired Classes and Equity Interests

As a condition to confirmation, the Bankruptcy Code requires that at least one impaired class of Claims or Equity Interests accepts the Plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the Claims or Equity Interests of that Class are modified, other than by curing defaults and reinstating the maturity dates thereof or by payment in full. The Bankruptcy Code defines acceptance of a plan by an impaired class of Claims as acceptance by holders of two-thirds in dollar amount and a majority in number of Claims of that class. For that purpose, the Bankruptcy Code counts only those who actually vote to accept or to reject the Plan. Holders of Claims who fail to vote are not counted as either accepting or rejecting the Plan.

Holders of Claims in Classes 2-5 are entitled to vote on the Plan. Equity Interests will not retain any rights under the Plan on account of such interests and, therefore, Class 6 is deemed to have rejected the Plan. The Debtors' will not solicit votes from holders of Class 6 Equity Interest holders.

### 2.    Classes That Are Not Impaired

Classes of Claims that are not "impaired" under the Plan are deemed to have accepted the Plan. Class 1 Election B Priority Deposit Claims are not Impaired and, therefore, Class 1 is deemed to have accepted the Plan. The Debtors' will not solicit votes from holders of Class 1 Creditors.

## C.    Cramdown Provisions

The Bankruptcy Code contains provisions for confirmation of a plan even of the plan is not accepted by all impaired classes, so long as one impaired class of claims has accepted it. The

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

"cramdown" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying the usual requirements of section 1129 of the Bankruptcy Code, it (i) "does not discriminate unfairly" and (ii) is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law.

In general, the cramdown standard requires that a dissenting class receive full compensation for its allowed claims before any junior class of claims receives any distribution.

In the event that any Classes are determined to have rejected the Plan in accordance with section 1126 of the Bankruptcy Code, the Debtors will utilize the provisions of section 1129(b) of the Bankruptcy Code to satisfy the requirements for confirmation of the Plan.

## D.    Best Interests of Creditors

Notwithstanding acceptance of the Plan by the vote of Creditors, in order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all Classes of Creditors and Equity Interest holders that are impaired under the Plan. The "best interests" test requires that the Bankruptcy Court find that the Plan provides each member of each impaired Class a recovery having a value at least equal to that which each Class member would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.

To estimate what members of each impaired Class would receive under Chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the Chapter 11 Case were converted to Chapter 7 and the assets were liquidated by a trustee in bankruptcy (the "Liquidation Value"). The Liquidation Value would consist of the net proceeds from the disposition of the Debtors' assets, plus Cash held by the Debtors. The Liquidation Value would be reduced by (a) the amount of Secured Claims; and (b) the costs and expenses of the liquidation, as well as Administrative Expense Claims of the Debtors' Estates.

Once the percentage recoveries in liquidation of Secured Claims, Priority Claims and Unsecured Claims are ascertained, the Distributions available out of the Liquidation Value are compared with the value of the property offered to each class of Claims and Equity Interests under the Plan. This enables the Bankruptcy Court to determine whether the Plan meets the best interests of each Creditor and Equity Interest holder.

The Debtors are confident that holders of Class 2, 3 and 5 Claims will receive a greater return under the Plan than would be received under Chapter 7. If the Chapter 11 Cases were converted to Chapter 7 on the Effective Date, all of the Artecity Project and other property of the Debtors would either be (i) sold in bulk at a Section 363 Sale with CCV entitled to credit bid the full amount of its debt and the entire property be transferred in partial satisfaction of its debt, leaving no proceeds for distributions to other creditors, or (ii) abandoned by a Chapter 7 trustee as burdensome and of inconsequential value and benefit to the Debtors' estates, leaving no

40

distribution to other Creditors. Administrative expenses will be substantially less under the Plan than if a Chapter 7 trustee were responsible for liquidating the assets and making distributions to Creditors. Under the Plan, only the actual, reasonable and necessary expenses of liquidation will be a charge against the Estate Assets, while in a Chapter 7 liquidation both the Chapter 7 trustee's flat percentage fee plus the fees and expenses of the trustee's professionals would be chargeable against the Estate prior to making distributions to Creditors.

**E.    Feasibility of the Plan**

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. The Debtors believe that all obligations described in the Plan will be timely performed since the most significant obligations will be performed immediately after confirmation.

**F.    Alternatives to the Plan**

The Debtors believe that the Plan provides Creditors with the greatest possible value that could be realized on their Claims. The primary alternatives to confirmation of the Plan are liquidation of the Debtors under chapter 7 of the Bankruptcy Code or dismissal of the Chapter 11 Cases. In a chapter 7 liquidation, the Debtors believe that Unsecured Creditors would receive nothing for their Claims after payment of Administrative Expenses and CCV's Claim. Under the Plan, they are entitled to receive a portion of litigation recoveries. Similarly, if the Chapter 11 Cases were dismissed, CCV could continue to prosecute the Foreclosure Case and, upon a foreclosure sale, CCV could credit bid the amount of its undersecured Claim, leaving nothing left for Unsecured Creditors.

**G.    Risks Associated With Plan Confirmation**

The Debtors' Plan involves a degree of risk, and this Disclosure Statement and the Plan contain forward-looking statements that involve risks and uncertainty. The Reorganized Debtors' actual results could differ materially from those anticipated herein as a result of a variety of factors. Holders of Claims should consider the following, in addition to the other information contained in this Disclosure Statement, before submitting a vote to accept of reject the Plan. *You should consult with your accountant or other financial advisor if you have any questions pertaining to the Debtors' projections in this Disclosure Statement.*

## SECTION VI
## DISCLAIMERS REGARDING TAX CONSEQUENCES

The following discussion briefly summarizes some of the more significant federal income tax consequences of the Plan to the Debtors based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), the Treasury regulations promulgated thereunder, the judicial authorities and current administrative rulings. In addition, certain aspects of the following discussion are based on proposed Treasury regulations.

The tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below. The Debtors have not requested a ruling from the Internal Revenue Service (the "IRS"), nor will any opinion of counsel be obtained by the Debtors with respect to the federal income tax consequences of the Plan. There can be no assurance that the

IRS will not challenge any or all of the tax consequences of the Plan, or that if such challenge is asserted, would not be sustained.  Further, the federal income tax consequences to the Debtors, the Creditors and the Interest holders may be affected by matters not discussed in the Plan and Disclosure Statement.

**A.      Disclaimer Regarding Tax Consequences of the Plan**

THE DEBTORS' MANAGEMENT AND THEIR RESPECTIVE COUNSEL AND FINANCIAL ADVISORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN WITH RESPECT TO THE DEBTORS, CREDITORS OR HOLDERS OF EQUITY INTERESTS, NOR ARE THEY RENDERING ANY FORM OF LEGAL OPINION OR TAX ADVICE ON SUCH TAX CONSEQUENCES.    THE TAX LAWS APPLICABLE TO COMPANIES IN BANKRUPTCY ARE EXTREMELY COMPLEX.  CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS REGARDING TAX CONSEQUENCES OF THE PLAN, INCLUDING FEDERAL, FOREIGN, STATE AND LOCAL TAX CONSEQUENCES.

**B.      Circular 230 Disclaimer**

THE IRS REQUIRES WRITTEN ADVICE REGARDING ONE OR MORE U.S. FEDERAL TAX ISSUES TO MEET CERTAIN STANDARDS. THOSE STANDARDS INVOLVE A DETAILED AND CAREFUL ANALYSIS OF THE FACTS AND APPLICABLE LAW WHICH WE EXPECT WOULD BE TIME CONSUMING AND COSTLY. WE HAVE NOT MADE AND HAVE NOT BEEN ASKED TO MAKE THAT TYPE OF ANALYSIS IN CONNECTION WITH ANY ADVICE GIVEN IN THE FOREGOING DISCUSSION.  AS A RESULT, WE ARE REQUIRED TO ADVISE YOU THAT ANY U.S. FEDERAL TAX ADVICE RENDERED IN THE FOREGOING DISCUSSION IS NOT INTENDED OR WRITTEN TO BE USED AND CANNOT BE USED FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED BY THE IRS.

**SECTION VII**
**RECOMMENDATION**

FOR ALL OF THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE DEBTORS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF THE PLAN ARE PREFERABLE TO ALL OTHER ALTERNATIVES.

**SECTION VIII**
**CONCLUSION**

THE DEBTORS URGES ALL CREDITORS TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO AS TO BE RECEIVED BY THE CLERK OF THE BANKRUPTCY COURT AT 51 S.W. FIRST

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

AVENUE, ROOM 1510, MIAMI, FL 33130 ON OR BEFORE JUNE 20, 2011 AT 4:00 P.M.
(EASTERN STANDARD TIME).

Respectfully submitted,

Artecity Management LLC
By:/s/ Claudio Benedetti
      Claudio Benedetti, as Managing Member

Artecity Holding Ltd.
By:  Artecity Management LLC, its General Partner
      By:/s/ Claudio Benedetti
          Claudio Benedetti, as Managing Member

Artecity Plaza LLC
By:  Artecity Management LLC, its Manager
      By:/s/ Claudio Benedetti
          Claudio Benedetti, as Managing Member

Artepark South Development LLC
By:  Artecity Management LLC, its Manager
      By:/s/ Claudio Benedetti
          Claudio Benedetti, as Managing Member

Artecity Governor L.L.C.
By:  Artecity Management LLC, its Manager
      By:/s/ Claudio Benedetti
          Claudio Benedetti, as Managing Member

Artecity Park LLC
By:  Artecity Management LLC, its Manager
      By:/s/ Claudio Benedetti
          Claudio Benedetti, as Managing Member

Park Villas Development LLC
By:  Artecity Management LLC, its Manager
      By:/s/ Claudio Benedetti
          Claudio Benedetti, as Managing Member

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 34th Floor, Miami Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789